STATE OF CONNECTICUT *v.* ERIC SCOTT
(SC 16812)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued March 23—officially released July 13, 2004

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, was *David I. Cohen*, state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Eric Scott, appeals[1] from the judgment of conviction, rendered after a jury trial,

[1] The defendant was convicted in 1983. The defendant subsequently filed an appeal from the judgment of conviction in the Appellate Court, and this court transferred the appeal to itself in January, 1985. The appeal was withdrawn, however, in October, 1985. The defendant then filed a petition for writ of habeas corpus in May, 1998, claiming ineffective assistance of trial and appellate counsel. In May, 2002, the parties agreed before the habeas court that the state would request that the defendant's right to

of one count of kidnapping in the first degree in violation of General Statutes (Rev. to 1981) § 53a-92 (a) (2) (A), one count of assault in the second degree in violation of General Statutes (Rev. to 1981) § 53a-60 (a), and three counts of sexual assault in the first degree in violation of General Statutes (Rev. to 1981) § 53a-70 (a). He claims that: (1) his conviction on two counts of sexual assault, arising from his vaginal penetration of the victim twice within an interval of minutes, violated his double jeopardy rights; and (2) the trial court improperly instructed the jury on flight as consciousness of guilt. We affirm the judgment of conviction.

The defendant was charged with one count of kidnapping in the first degree, two counts of assault in the first degree, and three counts of sexual assault in the first degree. The jury found him guilty on the kidnapping count, on one count of assault, and on the three counts of sexual assault. The trial court rendered judgment in accordance with the jury's verdict. This appeal followed.

The jury reasonably could have found the following facts. The defendant, while on leave from active military duty with the United States Army in Germany from December 10 through December 31, 1982, was staying with his parents at their home on Fairview Avenue, in Norwalk. While in Norwalk, the defendant had the use of a 1974 blue Mazda RX4 automobile, bearing Connecticut license plate number JW-1466, which was owned by the defendant's friend, Paul Stevens, and registered in the name of Stevens' father. Stevens was the only one who used the car, except when he loaned it to friends. Stevens, who was away in Washington, D.C., from December 23 through December 31, 1982, had

appeal and to sentence review be restored in exchange for the defendant's withdrawal of his habeas petition with prejudice. The defendant subsequently filed this appeal to this court, pursuant to General Statutes § 51-199 (b) (3).

given the defendant free use of the car, provided that the defendant was to drive Stevens' mother to and from work in the morning and afternoon.

At approximately 5 a.m. on December 28, 1982, the victim was jogging southbound along Van Buren Avenue in Norwalk when the defendant, driving Stevens' car southbound on Van Buren Avenue, drove up onto the sidewalk and struck the victim's left leg, knocking her to the ground and causing injury. The defendant stopped the car and got out to ask if the victim needed help. The victim declined any help and began running northbound in the direction of her home. Looking over her shoulder as she ran, the victim noted that the car was a small, dark colored, late model sedan bearing Connecticut license plate number JW-1466. The car passed the victim and then turned so as to come at her again. The victim turned and began running southbound when the car mounted the sidewalk and struck her a second time, striking both legs and throwing her forward to the ground, causing additional injuries. Once again, the defendant got out of the car and asked the victim if she needed help, saying that he would drive her to the hospital. The victim again declined the defendant's request that he take her to the hospital. She tried to run away, but the defendant grabbed her from behind and placed his hand over her face and mouth. When the victim tried to scream and attempted to escape, the defendant wrestled with her, telling her to "shut up or he would kill" her. He then drew the victim's clothing over her head, restraining her head and hands and rendering her unable to see, and forced her into the car.

The victim was wedged between the car's front bucket seats, and although she was unable to see, she noted a heavy, sweet odor and heard coins jingling about on the floor. They drove for approximately ten minutes, whereupon the defendant stopped the car and attempted to pull down the victim's pants. When he

encountered difficulty, she offered to help in the hope that if she cooperated with him, he would not kill her. Once the victim's pants were down about her knees, the defendant penetrated her vagina with his penis. When he encountered difficulty in fully penetrating the victim, however, the defendant withdrew his penis and repositioned the victim by turning her on to her side, whereupon he once again penetrated her vagina with his penis while simultaneously penetrating her anus with his finger. Both penetrations of her vagina occurred within approximately two or three minutes. Approximately five minutes later, after ejaculating inside the victim, the defendant withdrew his penis and, leaving the victim wedged on her side between the front seats, started the car and resumed driving. The defendant drove for approximately ten minutes until he stopped the car and pushed the victim out of the car and onto the ground. The victim watched the car drive away. She then flagged down a passing car occupied by two men, who drove her to the hospital. Upon arriving at the hospital, the victim informed the hospital staff that she had been sexually assaulted, and they contacted the police. The victim was examined, a rape kit was prepared, and the police interviewed the victim, who described the incident to them, including the description and license plate number of the car.

The next day, December 29, 1982, the victim was shown the car by the police, who had located it in the driveway of the defendant's parents' home, which was located about two blocks from Van Buren Avenue. The police had secured a search and seizure warrant for the car and had towed it to police headquarters. The victim identified it as the car that had struck her. The car had the identical license plate number, and a sweet odor in its interior emanating from a deodorizer hanging in the car, which the victim identified as the same odor she had detected, and two bucket seats. There was also

loose change underneath the console cover. In addition, on December 29, the victim unequivocally identified a photograph of the defendant from a photographic lineup, as that of her assailant. She again identified the defendant at trial as her assailant.

The jury also could have found, from the testimony of the defendant and his girlfriend, Simone Downer, that, on the night of December 27, 1982, he had stayed overnight at Downer's house on Ponus Avenue, Norwalk, which was a three minute drive from the defendant's parents' house. The defendant left Downer's house at approximately 4 a.m. on December 28, driving Stevens' car.

The defendant was questioned by the police on December 29, 1982. He subsequently left Norwalk by flying to Colorado, from where he flew back to his military post in Germany. Thereafter, he was arrested and returned by the military to face the charges in the present case.

I

The defendant first claims that his conviction of two counts of sexual assault in the first degree in violation of General Statutes (Rev. to 1981) § 53a-70 (a),[2] violated his federal constitutional right not to be placed twice

---

[2] General Statutes (Rev. to 1981) § 53a-70 (a) provides: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

General Statutes (Rev. to 1981) § 53a-65 (2) provides in relevant part: " 'Sexual intercourse' means vaginal intercourse, [and] anal intercourse . . . between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal intercourse, [and] anal intercourse . . . and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body. . . ."

in jeopardy for the same offense.[3] Specifically, the defendant claims that the two penetrations of the victim's vagina constituted one offense, not two separate offenses, because they were so closely related in time and, therefore, constituted one continuous act. Therefore, the defendant contends, his conviction for two separate counts of sexual assault violated the double jeopardy clause.[4] The state claims, to the contrary, that the two separate acts of forcible penetration constituted two separate offenses pursuant to § 53a-70 (a), and, therefore, there was no double jeopardy violation. We agree with the state.

"Double jeopardy prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense. . . . The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The defendant on appeal bears the burden of proving that the prosecutions are for the same offense in law and fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Kulmac*, 230 Conn. 43, 67, 644 A.2d 887 (1994).

It is axiomatic that the double jeopardy guarantee against multiple punishments for the same offense in the same trial does no more than prevent greater punish-

---

[3] Although the defendant also claims a state constitutional double jeopardy violation, he has not separately briefed that claim. Therefore, we limit our review to his federal constitutional claim. *State* v. *Vega*, 259 Conn. 374, 384 n.15, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

[4] The defendant fully preserved this claim at trial by moving to compel the state to elect which of the two counts alleging the vaginal penetrations it would proceed on, by moving for judgment of acquittal on those counts at the end of the state's case, and by moving for arrest of judgment after the jury's verdicts on those counts.

ment than the legislature intended. *Missouri* v. *Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983); *State* v. *Ferguson*, 260 Conn. 339, 361, 796 A.2d 1118 (2002). Our case law has long established that each act of criminal sexual conduct, as defined by our criminal statutes, is separately punishable under those statutes and, therefore, in such cases there is no double jeopardy violation because they do not arise out of the same act or transaction. *State* v. *Frazier*, 185 Conn. 211, 228–30, 440 A.2d 916 (1981) (multiple forcible sexual assaults during course of burglary), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982); *State* v. *Snook*, 210 Conn. 244, 260–63, 555 A.2d 390 (multiple acts of risk of injury to child), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); *State* v. *Kulmac*, supra, 230 Conn. 68 (separate acts of vaginal penetration by finger and penis); see also *State* v. *Albert*, 252 Conn. 795, 805, 750 A.2d 1037 (2000) (sexual assault statutes designed to punish fact, not degree, of penetration).

Regarding the defendant's claim that there must be a certain unspecified length of time between each act of penetration for the acts to constitute distinct and, therefore, separate punishable offenses, as opposed to one continuous act, we stated in *State* v. *Miranda*, 260 Conn. 93, 122–23, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002), that "[d]ouble jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, *however closely they may follow each other* . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one

and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Citations omitted; emphasis added; internal quotation marks omitted.) "A different view would allow a person who has committed one sexual assault upon a victim to commit with impunity many other such acts during the same encounter." *State v. Frazier*, supra, 185 Conn. 229; *State v. Cassidy*, 3 Conn. App. 374, 388, 489 A.2d 386 ("[E]ach assault upon the victim involved a separate act of will on the part of the defendant and a separate indignity upon the victim. . . . [T]he legislative intention was that each assault should be deemed an additional offense. . . . To interpret the statute otherwise would be to strip it of all its sense." [Citation omitted; internal quotation marks omitted.]), cert. denied, 196 Conn. 803, 492 A.2d 1239 (1985).

Applying these principles to the present case, we conclude that the two forcible vaginal penetrations were each separately punishable under § 53a-70 (a). That statute makes punishable the act of forcible penetration itself, and, therefore, each penetration by the defendant constituted a separate and distinct repetition of the same prohibited act, irrespective of the brief period of time separating them.[5] Therefore, the two separate convictions for sexual assault in the first degree did not violate the defendant's protection against double jeopardy.

---

[5] We do not foreclose the possibility that there might be a rare case in which two physically separate penetrations of the same bodily orifice are so closely related in time that, under the facts of that case, separate convictions might run afoul of a constitutional vagueness claim as applied to the facts of the case. Cf. *State v. Luurtsema*, 262 Conn. 179, 203–204, 811 A.2d 223 (2002); id., 204–206 (*Borden, J.*, concurring). This, however, is not such a case.

## II

The defendant next claims that it was improper for the trial court to instruct the jury on flight as consciousness of guilt. Although it is somewhat difficult to parse the precise bases of the defendant's claim, as best as we can we distill them into two closely related parts, they are: (1) there was no evidentiary basis for such an instruction because in returning to his military post in Germany the defendant did not flee; and (2) giving the instruction raised an "implicit issue" under the supremacy clause of the federal constitution because the defendant was militarily obligated to return to his post in Germany.

The state contends, in response, that there was a "reasonable construction of the evidence" justifying giving the instruction, and that "[i]nforming the jury of the availability of this reasonable, permissive evidentiary inference . . . was not precluded by federal law." We agree with the state. Accordingly, we reject the defendant's claims.

The following additional facts and evidence are necessary for the resolution of the defendant's claim. It is undisputed that, at approximately 7 p.m., on December 29, 1982, the defendant and his father went to the Norwalk police department detective bureau to meet with Detective John Suchy.[6] Suchy advised the defendant of his constitutional rights, and that, although he was not under arrest, he was a suspect in the case. The defendant agreed to talk with Suchy. They discussed the defendant's military status, where he was stationed, and that he was on leave. At trial, the defendant testified that he had told Suchy that he was due to return to his

---

[6] That morning, the defendant had called Suchy to inquire why Stevens' car, which the police had seized and towed to the police department, was missing from his parents' driveway. Also, the defendant's brother had told the defendant that the police wanted to talk to him.

post on December 30, 1982. Suchy testified that he could not recall whether the defendant had given him a specific date on which he had to be back at his post.

In the interview, the defendant denied attacking the victim. Suchy testified that, at approximately 9:30 p.m., the defendant requested that the interview stop. He stated that he wanted to go home to discuss the matter with his parents, and that he wanted to get things straightened out with his mother and his girlfriend. He told Suchy, however, that he would return to discuss the case again with Suchy as soon as he did so. Suchy testified further that he told the defendant that he was free to go, that he asked the defendant to return, and that the defendant told him that he would be back to talk to Suchy as soon as the defendant "got things straightened out with his mom and [girlfriend]." It was Suchy's understanding that the defendant would return that night. The defendant testified, however, that he did not indicate that he would return to the police station at all. He did acknowledge, however, that Suchy might have said something to him about coming back that night. The defendant left the police station at approximately 9:30 p.m., and never returned at any time.

On the next day, December 30, 1982, Suchy prepared a warrant for the defendant's arrest. On that same day, the defendant's father had a conversation with Suchy to the effect that another detective had told him that a warrant was going to be issued for the defendant's arrest, and the defendant's father requested the opportunity to bring the defendant to the police department himself before the defendant left. The defendant's father testified that he had told the defendant that the police were going to issue a warrant for his arrest, that it would be a good idea for the defendant to go back to the police department before returning to Germany, and that he had tried to talk the defendant into doing so. On the same day, the defendant's father called Suchy

and told him that he had located the defendant and would bring him to the police station. He later called Suchy, however, and told him that: the defendant had left; he did not know where the defendant was; he last saw the defendant in a car on Post Road, where he tried to get the defendant to return to the police station with him; but the defendant did not go with him.

The defendant testified that his father had told him at some time between December 28 and December 30, 1982, that a warrant would be issued for his arrest. He also testified that his father had not attempted to bring him down to the police station, but had asked him to see an attorney, and that the two of them had gone to see an attorney. He did not testify, however, as to who the attorney was or what, if anything, the attorney advised him to do. He testified further that his military leave began on December 10 and was for "twenty to twenty-one days," and that he had had to be back at his duty station in Germany on "approximately December 30." Although the defendant could not recall the specific dates, he testified further that he flew to Colorado, and later reported to Fort Carson, where he secured a ticket for a flight from there to Germany. It is inferable from his father's testimony that the defendant left Norwalk sometime between December 29 and 31. The defendant testified that he had gone to Colorado because his brother lived near Colorado Springs, and because Fort Carson was the only place where he knew someone from Connecticut who was in the Army and who could get him a ticket back to Germany. He did not testify as to when he returned to Germany.

Over the defendant's objection, the trial court granted the state's request to charge the jury on flight as con-

sciousness of guilt.[7] The defendant does not challenge the content of the instruction. He claims, instead, that the instruction should not have been given at all.

"[T]he decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court. . . . We review the defendant's claim under this standard." (Citation omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 257 Conn. 192, 196, 777 A.2d 587 (2001).

"This court previously has stated that [f]light, when unexplained, tends to prove a consciousness of guilt

---

[7] The trial court charged the jury as follows: "I'm going to charge you on flight as evidence of consciousness of guilt. There is evidence in this case that upon learning of the police intending to apply for an arrest warrant for him, the defendant left Norwalk and went to Colorado. The state claims that this establishes that the defendant engaged in flight and that flight [left] unexplained, tends to prove a consciousness of guilt. The defendant on the other hand claims that he went to Colorado in conjunction with his military obligations in order to return to his military duties in Germany. The flight or concealment of a person immediately after the commission of a crime is not in and of itself adequate to establish his guilt. But it is a fact which if you find proven beyond a reasonable doubt may be considered by you in the light of all the other proven facts in deciding the question of his guilt or innocence. Whether or not the defendant took flight, fled from the state and if so, whether it shows a consciousness of guilt and the significance or weight to be attached to such a circumstance, are matters for you to determine. In instructing you on the subject of flight, I wish to make it clear that I'm not suggesting that he did so take flight. Whether he did take flight, is a question of fact for you to determine. If you find that he did take flight, leave from the jurisdiction, you will consider it as circumstantial evidence to be [considered] with all the other facts in the case. If you find that he did not take flight . . . that there was adequate explanation for his leaving the jurisdiction at the particular time that he left or that no explanation was required because there was nothing untoward with regard to his leaving, then you will disregard my instructions on this question. It can only be considered if you find that there is unexplained flight not adequately explained as to why the defendant left the jurisdiction after the particular circumstances. You will consider all of the testimony with regard to that and once again . . . if you cannot say that you are satisfied beyond a reasonable doubt that the state has established this point, then you must give the benefit of the doubt to the defendant. Or if you cannot say one

. . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration. . . . This court also has stated that [t]he fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 521–22, 820 A.2d 1024 (2003). "The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 54, 770 A.2d 908 (2001).

With this factual and legal background in mind, we first address the defendant's contention that there was no evidentiary basis for an instruction on flight as consciousness of guilt. We disagree.

As these principles make clear, the propriety of an instruction regarding consciousness of guilt based upon flight goes to the question of the defendant's state of mind. In other words, when a defendant has left the state following a crime, the question is: *why* did he do so? This requires an assessment by the fact finder of the defendant's motivations or reasons for leaving the state. If there is a reasonable view of the evidence that

---

way or the other, that means that there was no proof of flight with consciousness of guilt and you must give the benefit to the defendant."

would support an inference that he did so because he was guilty of the crime and wanted to evade apprehension—even for a short period of time—then the trial court is within its discretion in giving such an instruction because the fact finder would be warranted in drawing that inference. We conclude that there was such a reasonable view of the evidence from which the jury could have concluded that, given the particular timing and circumstances of the defendant's leaving, his conduct implied a consciousness of guilt.

There was evidence that the defendant knew that he was a suspect in the crimes involved, that he had indicated that he would return to the police station for further questioning but did not do so, that he knew that he was about to be arrested for the crime, that his father unsuccessfully had urged him to turn himself into the police, and that, with all of this knowledge, he nonetheless quickly left Connecticut for Colorado without informing the police of his whereabouts or of his intention to leave. Thus, the fact that it was not until after all of these facts became known to the defendant that he left to return to his military post permitted an inference of consciousness of guilt. Contrary to the defendant's contention, neither the court nor the jury was required to credit the defendant's implicit contention that the reason he left was not to evade apprehension but because of his military obligation. Although that was certainly a reasonable, innocent explanation for his conduct in leaving the state when he did, that was not the only reasonable explanation.

Furthermore, the court's instructions left that inference drawing choice specifically where it belonged, with the jury, under very balanced instructions. The trial court's charge underscored the defendant's explanation for his flight to Colorado and explicitly admonished the jury to find no consciousness of guilt in the event that it found that the defendant had acted in compliance

with his military obligations, rather than out of a desire to evade further questioning or arrest.

We next address the defendant's contention that the trial court's giving of the instruction implicitly violated the supremacy clause contained in article six of the United States constitution. The defendant, relying on 10 U.S.C. § 885,[8] which governs the subject of absence from the military without leave, "and the federal government's exclusive control over its active duty military service members," argues "that, under the supremacy clause, Connecticut cannot compel an active duty military service member to remain in Connecticut pending issuance and service of an arrest warrant when that service member has a legal obligation to depart Connecticut in order to comply with a valid military order." Thus, the defendant contends, the "[s]tate's power to compel an active duty service member to remain in the state pending issuance and service of an arrest warrant, *coerced by the risk of a flight as consciousness of guilt instruction,* is at issue in this case." (Emphasis added.) We agree with the state, however, that the supremacy clause does not govern "this situation involving a state trial court's instruction to the jury on flight as evidence of consciousness of guilt" where, as in the present case, that instruction is supported by evidence that the defendant left the state, not necessarily because of his federal military obligation, but partially, at least, because he wanted to evade the state's impending criminal process.

We begin our analysis by stating the law governing the preemption of state law by federal law. "The question of

---

[8] Section 885 of title 10 of the United States Code (1982) provides in relevant part: "(a) Any member of the armed forces who—

"(1) without authority goes or remains absent from his unit, organization, or place of duty with intent to remain away therefrom permanently;

"(2) quits his unit, organization, or place of duty with intent to avoid hazardous duty or to shirk important service . . . is guilty of desertion. . . ."

preemption is one of federal law, arising under the supremacy clause of the United States constitution. . . . Determining whether Congress has exercised its power to preempt state law is a question of legislative intent. . . . [A]bsent an explicit statement that Congress intends to preempt state law, courts should infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law . . . or where the state law at issue conflicts with federal law, either because it is impossible to comply with both . . . or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives . . . ." (Internal quotation marks omitted.) *Cox Cable Advisory Council* v. *Dept. of Public Utility Control,* 259 Conn. 56, 62–63, 788 A.2d 29, cert. denied, 537 U.S. 537, 123 S. Ct. 95, 154 L. Ed. 2d 25 (2002).

It is important to delineate what the defendant's claim does not involve. He does not claim that the federal law would have prevented the Norwalk police department from arresting him and taking him into custody while he was on leave, thereby preventing him from reporting back to Germany by December 31, 1982, the date his leave expired. In other words, he does not claim that 10 U.S.C. § 885 has preempted state criminal law to prohibit either the questioning or arrest of military personnel for crimes committed by them while on leave. Moreover, he does not claim that this case involves an instance of comprehensive congressional legislation intending to occupy the field of regulation regarding jury instructions in state criminal trials. The defendant also does not claim that Congress intended to exercise its power to preempt state law surrounding the investigation and prosecution of state crimes when it enacted legislation governing the military obligation of active duty service personnel to report back to duty following the expiration of leave. Nor does the defendant claim

that our law on flight as consciousness of guilt stands as an obstacle to the accomplishment and execution of congressional objectives regarding military leave.

What he does claim, instead, is that permitting a consciousness of guilt instruction in the present case is an instance of a state law, namely, our judge made law on flight as consciousness of guilt, conflicting with a federal law, namely, the absence without leave statute, because it was impossible for the defendant to comply with both laws. In the defendant's view, he was coerced, by the risk of a consciousness of guilt instruction, to risk evading his military obligation to report back to active duty in a timely fashion, and that, therefore, the trial court's instruction on flight penalized him for a catch-22 situation in which any choice he made would have been wrong. We think that this is an incorrect application of the supremacy clause.

First, as a factual matter, there is no evidence that the defendant's conduct in leaving the state was at all affected by the availability of such an instruction in the event of a subsequent trial. Thus, any suggestion by the defendant that he, in fact, believed that he was somehow placed in a catch-22 situation by the instruction, is purely fanciful. Indeed, even if we were to credit the defendant's testimony that he visited an attorney before leaving, the defendant did not testify as to whether—or what—the attorney advised him regarding his duty to report. Nor was there any evidence that he consulted his military superiors as to what to do. Contrary to the defendant's suggestion, we are not persuaded that the availability of a potential jury instruction on flight as consciousness of guilt, which was supported by a reasonable view of the evidence, constituted any form of state coercion that conflicted with federal law within the contemplation of the supremacy clause.

Second, as the state points out, evidentiary matters and the trial of criminal cases arising under state law

are traditionally matters left to the states under well established principles of federalism. See *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977) (assumption of nonpreemption is triggered where field which Congress is said to have preempted has been traditionally occupied by states); *Perez* v. *Ledesma*, 401 U.S. 82, 84, 91 S. Ct. 674, 27 L. Ed. 2d 701 (1971) ("[t]he propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals . . . subject, of course, to review by certiorari or appeal in this [c]ourt" [citation omitted]); *Stefanelli* v. *Minard*, 342 U.S. 117, 120–21, 72 S. Ct. 118, 96 L. Ed. 138 (1951) ("The special delicacy of the adjustment to be preserved between federal equitable power and [s]tate administration of its own law, has been an historic concern of congressional enactment . . . . This concern has been reflected in decisions of this [c]ourt, not governed by explicit congressional requirement, bearing on a [s]tate's enforcement of its criminal law." [Citation omitted.]). These well established principles counsel strongly against concluding that the federal statute regarding absence without leave has preempted our state law on jury instructions regarding flight as consciousness of guilt, when those instructions are supported by a reasonable view of the evidence in the case. Needless to say, the defendant has not brought to our attention, and we have not identified, any case in which any court has held that, despite these well established principles, a state may not permit a jury to infer consciousness of guilt from flight, when that inference is supported by the evidence, solely because the defendant *also* had the obligation to report back to military duty. Put another way, the federal law on which the defendant relies addresses certain obligations of military personnel, and not what inferences may or may not be drawn at a state criminal trial. Because they address different subjects, they are not in conflict.

Third, there is, and was, no conflict between the two laws, because the defendant was able to comply with both. He could, and did, comply with his military obligation. He also could, and did, comply with state law by arguing to the jury, consistent with the balanced instructions given by the trial court, that, in view of his military obligation, the jury should not draw the inference sought by the state. When the evidence supports both sets of inferences referred to in the instructions, when the instructions clearly identify both of those sets of inferences for the jury, and when the defendant is free to present to the jury his reasons why it should draw the inferences consistent with his view of the evidence, there is no conflict between the state instructional law and his military obligation.[9]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[9] The defendant also claims that the trial court's instructions on flight as consciousness of guilt violated his right to a fair trial under the due process clause of the federal constitution. We agree with the state, however, that ordinarily such an instruction does not implicate constitutional rights, and, contrary to the defendant's contention, there is nothing in this case that would take it out of that general rule. Moreover, also contrary to the defendant's contention, the instruction did not violate his rights to remain silent or to present a defense.