# STATE OF CONNECTICUT. *v*. WALTER W. HINDS, SR.
# (AC 24687)

West, McLachlan and Dupont, Js.

Argued September 24—officially released December 21, 2004

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*Nancy L. Chupak,* assistant state's attorney, with whom, on the brief, was *Mary M. Galvin,* state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Walter W. Hinds, Sr., appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). On appeal, he claims that the court improperly (1) instructed the jury on consciousness of guilt, (2) failed to supplement its answer to a question posed by the jury during deliberations before the jury returned a verdict, (3) admitted into evidence a photograph of the defendant that was both irrelevant and prejudicial and (4) refused to instruct the jury using the defendant's requested language with regard to the

dangers of eyewitness identification. We affirm the judgment of the trial court.

On August 28, 2000, sixteen year old high school student K[1] was working as a cashier at the Super Stop & Shop supermarket in Milford. After finishing work at approximately 9 p.m., K left the store and started on foot to a friend's apartment that was approximately five minutes away. The route K followed required her to walk past buildings adjacent to Super Stop & Shop, to cross Seeman's Lane and to cut through the property of In-Line Plastics Tool Company (In-Line Plastics). As she crossed Seeman's Lane, K noticed a pickup truck exit the driveway of In-Line Plastics, reenter the parking area and come to a stop. As she walked past the truck, she turned around and observed that the driver had exited the vehicle and was walking behind her. She continued walking and, upon turning around again, she saw that the driver was right behind her and wearing only underwear and a sleeveless shirt. Although it was nighttime, the area was lit by lights on the surrounding buildings, enabling her to see the driver's face.

At that point, K started to run. The defendant ran after K, grabbed her and put one of his hands around her waist and his other hand over her mouth. He instructed her not to scream or he would kill her. The defendant then threw K to the pavement and dragged her by the legs into the bushes behind the In-Line Plastics building. The defendant sat on her chest with his feet on the outside of her arms and instructed K to open her mouth. He inserted his penis into her mouth and forced her to perform fellatio on him, ejaculating into her mouth. The defendant then patted her on the cheek and told her she could leave. Too afraid to move,

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

K remained where she was and, as the defendant walked back toward his truck, pleaded with him not to kill her, telling him that she would not tell anybody what had happened. The defendant turned around and looked at K, enabling her to see his face again. He then entered his truck and drove away. After the defendant left, K ran to her friend's apartment and told the friend that she had been sexually assaulted. K went to the kitchen sink, vomited and rinsed her mouth out. She then telephoned her aunt who contacted the police.

Officer Jeffrey Nielson of the Milford police department responded and met with K and her aunt. He obtained from K a basic description of the defendant and his vehicle and the location of the attack. He took K to the area behind the In-Line Plastics building, so she could identify the exact location of the attack. Nielson testified that the lighting in the area was good enough to see a person's face. Detective Nicholas Ricci met Nielson and K at the scene to begin an investigation. Ricci was unable to locate anyone in nearby homes or businesses who had heard or seen anything unusual that night. Ricci also was unable to find any physical evidence of the assault at the scene. Nielson transported K to the police station where she gave a formal written statement.

K described her attacker as a white male in his forties with a mustache, five feet, six inches to five feet, nine inches tall, of medium build and having strong body odor. She further described his hair color as gray and his truck as a full-size, blue pickup truck that was "not too new." Upon further questioning, K explained that her attacker's hair was a mixture of gray and dark hair and that the color of his truck was closer to green-blue. K did not mention that her attacker had any identifying tattoos, piercings or birthmarks.

K was taken to Milford Hospital where her pants and shirt were seized by the police for testing. There were

visible grass stains on both the knees and the seat of the pants. An examination by emergency room personnel revealed several bruises and scratches on K's right arm and hand, a red thumb print impression on her left cheek and a scratch on her lower right cheek. A rape kit also was administered, which included taking swabs of her mouth. Upon testing, these swabs failed to produce any evidence of semen. Hair found on K's clothing was tested and found not to be hers. Subsequent DNA testing revealed that the hair did not match that of the defendant.

K then returned to the Milford police department to assist in creating a computerized composite of her attacker. This composite subsequently was circulated to patrol officers in the department. Two days later, Detective Douglas Youd was notified that a person matching the composite and driving a pickup truck was seen in the parking lot of Waldbaum's supermarket in the Devon section of Milford. Upon responding, Youd observed a man fitting the description of the composite sitting in a pickup truck. Youd surveilled this individual and noticed that the man remained in the Waldbaum's parking lot for one-half hour without exiting his vehicle. The driver then left the parking lot and was observed driving to several other all-night supermarkets and convenience stores.

At approximately midnight on September 1, 2000, four days after the assault, Officer Henry Chacon executed a traffic stop of the defendant's truck.[2] From the individual's driver's license, Chacon identified the occupant as the defendant. Noticing that the driver's license listed a Maine address, Chacon asked the defendant where he was staying in the area. The defendant responded that he was staying at the Red Roof Inn in

---

[2] The traffic stop was executed because the truck's trailer hitch was partially blocking its license plate in violation of General Statutes § 14-18.

Milford while he performed construction work in the area. After issuing the defendant a warning for the traffic infraction, Chacon let the defendant go. Later that day, another Milford police officer visited the Red Roof Inn to confirm the defendant's story, but he was informed that no one bearing the defendant's name was registered at the Red Roof Inn or had been registered in the past six months. Staff at the Red Roof Inn did not recognize the person depicted in the composite.

The defendant remained under surveillance by the Milford police for the rest of the day. In the late afternoon, Detective Philip Maloney followed the defendant into the Waldbaum's parking lot in Milford. Maloney observed the defendant drive around the lot several times before parking. The defendant remained in his vehicle for approximately forty-five minutes during which time he paid "particular attention to females in the lot," including watching them walk to and from the store and load groceries into their cars.

Also on September 1, 2000, Ricci showed K a photographic array consisting of twelve black and white photographs of male subjects. K immediately pointed to the defendant's photograph and stated that she was sure that he was her attacker. K then signed the photographic array. An arrest warrant was issued for the defendant and, later on that same evening, two police officers stopped the defendant's truck and placed him on the ground to be handcuffed. As they were patting down the defendant for weapons, they noticed that his pants were undone and his genitals were exposed. After being advised of his *Miranda* rights, the defendant indicated his willingness to be interviewed. The two officers asked the defendant how long he had been in the area and where he was staying. The defendant responded that he had been in the area for about a week and living out of his truck. After being transported to the police station, the detectives asked the defendant his height,

weight and age. The defendant indicated he was five feet, seven inches tall, 190 pounds and forty-six years old. The detectives also photographed the defendant at the station. That photograph shows the defendant's hair to be a mixture of brown and gray, with similar coloring in his mustache and sideburns. The detectives also videotaped the defendant's truck, which was blue-green in color.

Following a trial, the jury returned guilty verdicts as to both charges. The defendant was sentenced to twenty-five years imprisonment on the kidnapping charge and twenty years imprisonment on the sexual assault charge, to run consecutively, for a total effective sentence of forty-five years. This appeal followed.

I

The defendant first claims that the court improperly instructed the jury regarding consciousness of guilt. Specifically, the defendant argues that (1) there was an insufficient evidentiary basis for such an instruction and (2) the instruction was legally inaccurate.[3] We agree that there lacked an adequate basis for the court's instruction but conclude that any error was harmless.

As a basis for its requested consciousness of guilt instruction, the state referenced two statements by the defendant that it contends were later proven false. The first of these statements arose in a conversation the defendant had with Chacon during the August 31, 2000 traffic stop. After stopping the defendant's vehicle and observing that he maintained a Maine address, Chacon

[3] Although the defendant claims that the court's instruction violated his due process rights under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut, it is well settled that issues involving a consciousness of guilt instruction do not implicate constitutional rights and the defendant has not identified any reason that would except his claim from this general rule. See *State* v. *Scott*, 270 Conn. 92, 111 n.9, 851 A.2d 291 (2004).

asked the defendant where he was staying in the area. Chacon testified: "He stated that he was living in Maine but currently staying at the Red Roof Inn in Milford, and that he was a construction worker in the area." A subsequent inquiry at the Red Roof Inn revealed that the defendant was not registered there.

The second statement at issue was made on September 1, 2000, during the defendant's conversation with detectives after his arrest for the assault. Maloney testified: "When we asked him how long he had been in the area, he said one week. . . . He said he's been in the area about a week." There was testimony at trial from Edward Stockwell, the owner of the company for which the defendant was working, that the defendant worked in the area for a short duration in April, 2000, and then from June, 2000, until his arrest in September, 2000.

On the basis of these two statements, the state submitted a written request to charge the jury on consciousness of guilt. The defendant took exception to the state's request, arguing that there was an inadequate evidentiary basis for such an instruction because the statements were not relevant to and did not demonstrate consciousness of guilt with regard to the assault on K. Over the defendant's objection, the court instructed the jury in relevant part as follows: "[T]he state claims here that [the defendant] made certain statements to the police on September 1, 2000, concerning his presence in the area. The state claims that some of his statements to the police were false. Now, if you find that [the defendant] did make false statements to the police, you may find that such statements tend to show a guilty connection by the accused with the crimes charged."[4]

---

[4] The court stated: "There is another legal principle that applies in this case called consciousness of guilt. Certain conduct of a person may be considered by you to show a guilty knowledge or consciousness of guilt. When a person is on trial for a criminal offense it is proper to show his conduct as well as any declarations made by him subsequent to the alleged criminal offense which may have fairly been influenced by that act. The state here claims that [the defendant] made certain statements to the police

The defendant raises two distinct claims with respect to the court's instruction. We address each in turn.

We first consider the defendant's claim that there was an insufficient evidentiary basis for the court's instruction. The defendant argues that the statements at issue could not reasonably have supported an inference of consciousness of guilt as to the assault on K, and the court, therefore, abused its discretion in issuing such an instruction. We agree.

The decision to give a consciousness of guilt instruction is left to the sound discretion of the trial court. *State* v. *Scott*, 270 Conn. 92, 104, 851 A.2d 291 (2004). We review the defendant's claim under this standard.

"Evidence that an accused had made false statements *tending to exculpate him from involvement in the crimes charged* has commonly been deemed to support a jury charge on consciousness of guilt. . . . Such a charge may be given when a party has made material misstatements because such fabrication or falsification implies that that party believes his or her case to be weak or unfounded." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Orta*, 66 Conn. App. 783, 792, 786 A.2d 504 (2001), cert. denied, 259 Conn. 907, 789 A.2d 997 (2002). "It is relevant to show . . . any statement made by [a defendant] subse-

on September 1, 2000, concerning his presence in the area. The state claims that some of his statements to the police were false. Now, if you find that [the defendant] did make false statements to the police, you may find that such statements tend to show a guilty connection by the accused with the crimes charged. In other words, any statements made by the accused subsequent to the alleged criminal act which are shown to be false, you may fairly infer guilty knowledge influenced by the criminal act itself. Such statements, which when shown to be false are circumstantial evidence of guilty conscience and have independent probative force. But remember, it is up to you as judges of the facts to decide [first] whether these statements or conduct of the accused were . . . false, and second, whether they reflect consciousness of guilt, and apply any weight you so desire, based upon these instructions."

quent to an alleged criminal act, *which may be inferred to have been influenced by the criminal act.*" (Emphasis added.) *State* v. *Burak,* 201 Conn. 517, 533, 518 A.2d 639 (1986).

Our Supreme Court has recently made clear that the propriety of an instruction regarding consciousness of guilt goes to the question of the defendant's state of mind, a determination which in turn requires an assessment of the defendant's motivations in making the statements at issue. See *State* v. *Scott,* supra, 270 Conn. 105. "If there is a reasonable view of the evidence that would support an inference that he did so because he was guilty of the crime and wanted to evade apprehension . . . then the trial court is within its discretion in giving such an instruction because the fact finder would be warranted in drawing that inference." Id., 105–106. In answering this question, it is appropriate to look to the timing of and circumstances surrounding the statements. See id., 106.

In the present case, the defendant's statement that he was staying at the Red Roof Inn, later proven false, could not reasonably give rise to an inference of consciousness of guilt regarding the assault on K. That statement was made in the course of a traffic stop for a motor vehicle violation that had nothing to do with the assault. During the defendant's conversation with the police at the time of the traffic stop, the assault was never mentioned nor did the police give any indication that they were investigating the defendant's potential involvement in another crime. It is also significant that, on the following day when the defendant was arrested for the assault, he readily told the police that he had been living out of his truck. Maloney testified: "[W]e asked him where he was staying, and he indicated that he was staying in his truck, in both Milford and Orange."

Our case law makes clear that not all false statements can support a charge on consciousness of guilt. As stated previously, only false statements "tending to exculpate [the accused] from involvement in the crimes charged"; *State* v. *Orta*, supra, 66 Conn. App. 792; or "which may be inferred to have been influenced by the criminal act"; *State* v. *Burak*, supra, 201 Conn. 533; are sufficient to form an evidentiary basis for such a charge. The state has failed to persuade us that the defendant's statement that he was living at the Red Roof Inn when he was actually living out of his truck was motivated by guilt with regard to the assault or made in an attempt to exculpate himself from involvement in the assault. Furthermore, any such connection is made more tenuous by the fact that the statement was made during a traffic stop unrelated to the assault.

The other statement at issue—that at the time of his arrest on September 1, 2000, he had been in the area for about one week—is similarly insufficient to form a factual basis for the consciousness of guilt charge. As a preliminary matter, it is not clear from the record that this statement was false. At trial, the defendant offered the testimony of Carol Hanna, to whom he was married at the time of the assault. She testified that the defendant had been home in Maine with her on the weekend prior to the assault, August 26 and August 27, 2000, and that he returned to Connecticut in the afternoon of August 27. Although Stockwell testified that the defendant had been *working* in Milford since June, the defendant had been back in Connecticut, after his trip to Maine to see his wife, for approximately one week at the time of his arrest. Therefore, the statement, while not completely truthful, does not appear to be completely false.

Furthermore, even if the statement was false, it did nothing to exculpate the defendant from the assault because he specifically admitted to being in Connecti-

cut on the day of the assault. Maloney testified: "We asked him if he had been in the area the previous Monday and he indicated that he was."

Neither of these two statements occurred under circumstances that would support an inference that they were made in an effort to exculpate the defendant from the assault or that they were in any way influenced by the assault. We therefore conclude that there lacked a sufficient evidentiary basis for the consciousness of guilt charge. This analysis does not end our inquiry, however, because we must next consider whether the improper instruction warrants reversal and a new trial. This requires application of the harmless error doctrine.

Both this court and the Supreme Court have stated that whether an instructional error in a criminal case requires reversal of the conviction depends on whether the error is of a constitutional or a nonconstitutional nature. If the instructional error is nonconstitutional, the defendant has the burden of establishing that it is reasonably probable that the jury was misled. See *State v. Coleman*, 14 Conn. App. 657, 678, 544 A.2d 194, cert. denied, 208 Conn. 815, 546 A.2d 283 (1988). It has been stated numerous times that consciousness of guilt issues are evidentiary and not constitutional in nature. See, e.g., *State v. Merritt*, 36 Conn. App. 76, 96, 647 A.2d 1021 (1994), appeal dismissed, 233 Conn. 302, 659 A.2d 706 (1995). The burden, therefore, lies with the defendant to demonstrate that it is reasonably probable that the jury was misled. See *State v. Coleman*, supra, 678.

The defendant has failed to demonstrate that the jury likely relied on an improper inference of consciousness of guilt in reaching its verdicts on both charges. In her statements to the police immediately following the attack, K accurately described the defendant's physical characteristics, including his approximate height, age,

build and facial hair, and accurately described the type and color of his vehicle. There was testimony from Ricci that K was unequivocal in her identification of the defendant from a photographic array that contained photographs of eleven other men of very similar appearance. Ricci testified that K indicated she was "absolutely sure" that the person she identified was her attacker. K also indicated in her statement to the police that her attacker had very strong body odor, a characteristic confirmed by the defendant's employer who testified as to his "noticeable body odor." There also was testimony that the defendant was observed in another Milford area parking lot engaging in suspicious behavior, including sitting in his vehicle for an extended period of time during which he paid "particular attention to the females in the lot."

Given the strength of this evidence, we cannot reasonably conclude that the consciousness of guilt evidence influenced the jury's verdicts. We accordingly conclude that the jury was not likely misled by the court's improper instruction.[5]

## II

The defendant next claims that the court improperly failed to supplement its answer to a question posed by the jury during deliberations before the jury returned a verdict. Although we agree that the court should have provided a complete and accurate answer to the jury's question, we conclude that the court's failure to do so was harmless.

During its deliberations, the jury sent the following note to the judge: "Question: Re: the video tape recovered from Stop & Shop. What was the time and date? (Detective Ricci?)" After conferring with counsel and

---

[5] Having concluded that the consciousness of guilt instructions were harmless, we need not consider the substance of the instructions for any claimed legal inaccuracies.

the court monitor, the judge summoned the jury back to the courtroom and explained: "[W]e have reviewed the testimony of Detective Ricci as it relates to the specific request for time and date. We are unable to locate that specific testimony as to time and date. . . . There is none. And we will review it again, but should you want further information regarding this issue, please, communicate by way of note and please have the foreperson sign it." The judge then instructed the jury to continue with its deliberations. Soon thereafter, it was brought to the court's attention by the state's attorney, who had reviewed her notes, that Ricci may have testified as to the date of the videotape. The court monitor proceeded to replay Ricci's testimony to confirm the state's attorney's statement. Before this process was completed the court stated: "You can stop that. We've just been informed that the jury has reached a verdict. All right." After the jury returned to the courtroom and read its verdict, the court accepted the verdict and dismissed the jury. There was, at the time, no objection to the court taking the verdict.

Following trial, the defendant filed a motion for a new trial in which he alleged that the court's failure to supplement its answer to the jury's question violated his due process right to a fair trial. After a hearing, the court denied the motion. The defendant contends that it was improper for the court to accept the verdict as it was based, at least in part, on an inaccurate understanding that there was no testimony regarding the date of the videotape.

Our review of Ricci's testimony reveals that he did, in fact, testify as to the date the videotape was taken. He stated: "The videotape was of that evening of the 28th." If the court had postponed accepting the jury's verdict until such time as the court monitor could complete her review of Ricci's testimony, it could have supplemented its earlier inaccurate answer to the jury's

question and allowed the jurors, if they desired, to continue deliberating in light of this information. Practice Book § 42-26 provides that upon a request for review of testimony the court "shall have the requested parts of the testimony read to the jury." Our Supreme Court has ruled that it is error for the court to refuse to respond to a written question from the foreperson of the jury regarding a request for further instruction or the applicable legal standard. *State* v. *Fletcher*, 207 Conn. 191, 193, 540 A.2d 370 (1988). Here, the jury did not request to rehear certain evidence or seek clarification of the applicable legal principles, but merely asked whether the evidence contained certain information. The court should have answered the question when the information became available.

While we conclude that the court should have supplemented its earlier answer, the failure to do so in the present case amounts to harmless error. The court's review of Ricci's testimony would have revealed that he testified that the videotape was taken on August 28, 2000, the night of the assault. If anything, this information would have tended to inculpate the defendant by putting a vehicle similar to his in the Super Stop & Shop parking lot on the night in question. Furthermore, the court informed the jury that it would continue to search for the answer and invited further questions on the issue, but the jury, nevertheless, continued deliberating and reached a unanimous verdict without waiting for the court to review Ricci's testimony. If the jury had believed that it needed a definitive answer to its question in order to reach a verdict, it surely could have awaited the court's review of Ricci's testimony, and its failure to do so indicates that this information was not a critical factor in its verdict.

We accordingly conclude that it was improper for the court to accept the verdict without supplementing

its answer to the jury's question, but that this error was harmless.

## III

The defendant next claims that the court improperly admitted into evidence a photograph of the defendant taken while he was incarcerated. The defendant argues that this photograph was irrelevant to the proposition it was admitted to prove and that it was unduly prejudicial. We agree with the defendant that the photograph was improperly admitted.

The standard of review we apply to a court's evidentiary rulings is well settled. "Such rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *Madsen* v. *Gates*, 85 Conn. App. 383, 399, 857 A.2d 412, cert. denied, 272 Conn. 902, 863 A.2d 695 (2004).

At trial, the defendant asserted the defense of mistaken identity. Underlying this defense was his argument that he could not have committed the sexual assault because, according to K's testimony and statements to the police, her attacker was wearing underwear at the time of the attack and, as a habit, he never wore underwear.

In rebuttal, the state presented the photograph at issue. This photograph was taken pursuant to a search warrant on May 16, 2002, approximately two years after the assault, while the defendant was incarcerated. The photograph depicts the defendant from the top of his

chest to just below his knees; his prisoner's jumpsuit pulled down around his knees and black paper tape covering his genital area. The photograph also showed a pair of white boxer-style underwear pulled down around the defendant's knees. The state sought to introduce this photograph to rebut the defendant's claim that he never wore underwear.

The defendant objected to the admission of the photograph on relevancy grounds, arguing that it was taken two years after the assault and while the defendant was incarcerated. Over the defendant's objection, the court admitted the photograph as a full exhibit.[6]

Evidence is irrelevant or too remote if there "is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." *State* v. *Kelly*, 77 Conn. 266, 269, 58 A. 705 (1904).

The photograph had little connection to the proposition it was admitted to prove. The fact that the defendant was wearing underwear in May, 2002, is not probative of whether he wore underwear in August, 2000, nearly two years earlier. In addition to the significant temporal gap between the date of the assault and the time the photograph was taken is the considerable change in circumstances that occurred during this interval. The defendant's incarceration during this two year gap constitutes a dramatic change in life circumstance that may have led him to reconsider and to abandon his existing manner of dress for a different one more suited to his new situation. The circumstances under

---

[6] Although at the time the photograph was admitted the court did not give the jury a cautionary instruction with respect to the fact that the defendant obviously was incarcerated when the photograph was taken, the court did issue a supplemental instruction to the jury immediately preceding deliberation that revealed his incarceration.

which the photograph was taken render it too remote from the assault to prove the proposition at issue.[7] We accordingly conclude that the court abused its discretion in admitting the photograph.

Having concluded that the court abused its discretion in admitting the photograph, we turn to the question of whether this error warrants reversal and a new trial. "In a case involving an evidentiary ruling, it is the defendant's burden to show that it is more probable than not that the court's action affected the result." (Internal quotation marks omitted.) *State* v. *Faria*, 47 Conn. App. 159, 175, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998).

"It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." (Internal quotation marks omitted.) *State* v. *Calderon*, 82 Conn. App. 315, 326, 844 A.2d 866, cert. denied, 270 Conn. 905, 853 A.2d 523, cert. denied, 543 U.S. 982, 125 S. Ct. 487, 160 L. Ed. 2d 361 (2004). The record reveals, and the defendant admits in his brief, that the substance of the improperly admitted photograph was cumulative of other validly admitted evidence. Detective Robert Riordan testified at trial that when he executed the search warrant, the defendant was wearing a prisoner's jumpsuit and "[a] white T-shirt and a white pair of boxer-style underwear." This testimony was not objected to at trial and is not challenged on appeal. We therefore conclude that the court's improper admission of the photograph constituted harmless error.

IV

The defendant last claims that the court improperly instructed the jury on eyewitness identification in that

---

[7] As we have concluded that the photograph was not relevant to the fact it was admitted to prove, we need not consider the defendant's additional argument that the photograph was prejudicial.

it failed to indicate that (1) eyewitness identification of a stranger is not as trustworthy as that of an acquaintance, (2) mistaken identification is very common, (3) while K testified that she was positive in her identification, this did not relieve the jury from its duty to carefully consider the identification evidence and to reject her identification if it was not reliable and (4) it is a matter of common knowledge that once a witness has identified someone prior to trial, that witness is not likely to change her testimony at trial. The defendant argues that the court's failure to give these specific instructions violated his right to due process under the federal and state constitutions.[8] We disagree that the instruction was improper.

The defendant filed a request to charge containing those four points and asserted on the record his reasons for doing so. These reasons included that K saw her attacker at nighttime and only for a short period of time. The court denied this request and issued its own instruction on eyewitness identification.[9] The defendant

___

[8] As the defendant does not separately address his state constitutional claim, we review this claim with regard to the federal constitution only. See *State* v. *Davidson*, 57 Conn. App. 541, 543 n.3, 750 A.2d 1106 (2000).

[9] The court instructed the jury as follows: "Eyewitness testimony. You've heard by way of evidence in terms of testimony by the defendant's witnesses regarding the habit and custom of [the defendant], as it relates to the issue of identification. There is a question in this case as it relates to whether or not [the defendant] . . . was in fact the person who committed the crime charged in counts one and two. And you are required to resolve any conflict or uncertainty on that issue. That's your job. In making that determination you may consider, and this relates to what we identify as eyewitness identification, you may consider the opportunity that the witness, [K], the eyewitness to this event had to see the person who committed the crime at the time it was committed. You may also consider the length of time that elapsed between the observation and later, the identification. This relates to eyewitness testimony. The value of identification testimony depends on the opportunity the witness had to observe the offense at the time of the offense, and to make a reliable identification later. In evaluating such testimony you should consider all of the factors mentioned in these instructions concerning your assessment of the credibility of any witness. You should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time of the offense. You may

took exception to the court's ruling on the ground that it was inadequate to guide the jury properly.

The standard of review for claims of instructional impropriety is well established. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole

consider in that regard such matters as the length of time the witness had to observe the person in question, the prevailing conditions at the time in terms of visibility or distance and the like, and whether the witness had known or observed the person at an earlier time. A witness uses his or her senses to make an identification. Usually the witness identifies an offender by the sense of sight, but this is not necessarily so, and other senses may be used. Here, there's evidence by [K] as to the body odor of her assailant. You should consider whether the identification made by the witness after the offense, was the product of her own recollection. You may consider, in that regard, the strength of the identification and the circumstances under which the identification was made, and the length of time that elapsed between the occurrence of the crime and the next opportunity the witness had to see the defendant. You may also take into account that an identification made by picking a defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness. If the identification by the witness may [have] been influenced by the circumstances under which the defendant was presented to her for identification, you should scrutinize the identification with great care. The state has the burden of proving identify beyond a reasonable doubt. It is not essential that the witness be free from doubt as to the correctness of the identification, however, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may find him guilty. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty."

to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Sanchez*, 84 Conn. App. 583, 591–92, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

Our review of the court's charge reveals that the jury was sufficiently instructed on eyewitness identification. As to the first and third points raised by the defendant, we conclude that the instruction adequately conveyed the general principles underlying the specific language requested. The court instructed the jury that "[t]he value of identification testimony depends on the opportunity the witness had to observe the [person in question] at the time of the offense, and to make a reliable identification later. . . . You should . . . consider, in particular, whether the witness had an adequate opportunity to observe the person in question . . . . You may consider in that regard such matters as the length of time the witness had to observe the person in question, the prevailing conditions at the time in terms of visibility or distance and the like, and whether the witness had known or observed the person at an earlier time." The mere fact that the court's instruction did not follow, to the letter, the defendant's request to charge does not itself render the instruction improper.

As to the second and fourth points raised, the defendant is correct that the court's instruction did not specifically state that misidentification is very common or that it is common knowledge that a witness is not likely to change her mind at trial after making an identification before trial. The defendant, however, has not offered any authority that such instructions are either necessary or proper nor are we aware of any such authority.

The judgment is affirmed.

In this opinion the other judges concurred.