# STATE OF CONNECTICUT *v.* SCOTT CANCEL
## (SC 16828)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

1

Argued March 15—officially released August 9, 2005

*A. Paul Spinella,* for the appellant (defendant).

*Christopher T. Godialis,* assistant state's attorney, with whom, on the brief, was *Scott J. Murphy,* state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. A jury found the defendant, Scott Cancel, guilty of murder as an accessory in violation of General Statutes §§ 53a-54a (a) and 53a-8 (a) in connection with the strangulation death of the victim, Robert Schmidt. The trial court rendered judgment in accordance with the jury verdict, and the defendant appealed.[1] The sole issue in this appeal is whether the trial court abused its discretion in failing to replay for the jury all of the testimony that the jury had requested

---

[1] The defendant appealed directly from the trial court's judgment to this court pursuant to General Statutes § 51-199 (b) (3).

to review at the outset of its deliberations.[2] We conclude that the trial court did not abuse its discretion in the circumstances of this case and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 20, 1989, Reverend Kenneth Gray found the body of the victim in a parking lot of the Bethel Church[3] in Southington as Gray was walking his twelve year old daughter to her school bus stop. The office of the chief medical examiner determined that the cause of the victim's death was asphyxia from ligature strangulation and further observed that the victim also had sustained a puncture wound to his forehead from "a pointed, sharp instrument, [such as] a needle." It was estimated that the victim's death had occurred sometime between 9 p.m. and 12 a.m. on December 19 and 20, 1989.

Shortly after Gray discovered the victim's body, the Southington police department learned that, on Decem-

---

[2] The defendant states in his brief that the testimony that the trial court improperly failed to replay for the jury was "material and exculpatory" and that, consequently, the trial court's actions were harmful. The defendant further states that the trial court abused its discretion and, therefore, the defendant was denied his right to a fair trial in violation of the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. To the extent that the defendant makes these statements to suggest that the harm was occasioned by the trial court's alleged abuse of its discretion, we need not reach this argument because we conclude that there was no abuse of discretion. To the extent that the defendant is advancing a separate constitutional claim that is premised on his right to a fair trial, we note that he offers no analysis or legal support for this claim. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] the parties cite no law and provide no analysis of their claims, we do not review such claims." (Citation omitted; internal quotation marks omitted.) *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004). Accordingly, we decline to review the defendant's constitutional claim.

[3] The Bethel Church is now known as the Apple Valley Worship Center.

ber 19, 1989, the victim had been driving a Honda Civic that was owned by his sister, Laura Schmidt. That car subsequently was found in the parking lot of Banquer's restaurant in New Britain where the victim had been employed as a bartender and bouncer by Jeffrey Stenner, the owner and operator of that restaurant. Thirteen latent finger and palm prints were lifted from the interior of the car and forwarded to the state police forensic laboratory for analysis. The laboratory, however, could not positively identify any of the prints.

At the time of the victim's murder, the Federal Bureau of Investigation (FBI) was investigating two armored car robberies that had occurred in West Hartford in 1987 and 1988. Because the victim and Stenner were suspects in those robberies, the FBI contacted the Southington police department to inquire whether the victim's murder and the robberies potentially were related. In 1992, the FBI arrested Stenner, Jill St. John and Perfecto Valle in connection with the two armored car robberies. Although the Southington police had pursued all available leads up to that point, the victim's murder remained unsolved, and the case was classified as dormant in 1993.

The Southington police department reopened its investigation of the victim's murder in 2000, when Michael Shanley, a detective with the Southington police department, took another look at the case. Shanley contacted the cold case committee of the state police forensic laboratory, which agreed to reexamine certain evidence. Due to technological advancements, the laboratory was able to identify, inter alia, a fingerprint that had been lifted from Laura Schmidt's Honda Civic shortly after the murder. The print belonged to John Grzeszczyk, who, in 1989, had worked for and socialized with the defendant.

With this new information in hand, Shanley and Lawrence E. Skinner, an investigator with the office of the

state's attorney, contacted Grzeszczyk for questioning in late July, 2001. After multiple interviews, Grzeszczyk confessed his role in the victim's murder and implicated the defendant, Stenner, Salvatore Zampi and Gilberto Delgado, all of whom subsequently were charged in connection with the victim's murder. Grzeszczyk, Zampi, and Delgado admitted their involvement in the crime and testified against the defendant at his trial. All three claimed that the defendant had ordered Grzeszczyk and Delgado to murder the victim, and that the defendant did so at the behest of Stenner. Stenner's motive for the murder was twofold. First, Stenner wanted to silence the victim because of his indiscretions concerning the armored car heists that the two had perpetrated together in West Hartford. Second, Stenner sought to collect the proceeds of a life insurance policy that he had purchased on behalf of the victim, naming himself as the sole beneficiary.

To orchestrate the murder, Stenner turned to the defendant, whom he had befriended at a local gym. The defendant enlisted the help of Zampi, his "second in command," Grzeszczyk and Delgado. The murder plot was hatched by the defendant, Zampi, Grzeszczyk and Delgado at a meeting that was held on December 19, 1989, at the first floor apartment of a two-family house located at 86 Austin Street in New Britain. After discussing various "[w]ays" in which to kill the victim, the defendant directed Grzeszczyk and Delgado to strangle him with a piece of rope later that evening. The defendant, however, decided that a backup plan was needed in the event that Grzeszczyk and Delgado "botch[ed]" the strangulation attempt. Their backup plan was to inject an "air bubble" into the victim's bloodstream using a syringe.

Because Grzeszczyk never had met the victim, the defendant and Grzeszczyk drove to Banquer's restaurant so that Stenner could "point out" the victim to

Grzeszczyk. Stenner subsequently arranged for the victim to accompany Grzeszczyk on an "errand" later that evening. Grzeszczyk and the defendant then returned to 86 Austin Street. Thereafter, Grzeszczyk and Delgado went to Banquer's restaurant to pick up the victim for their errand, and the victim willingly left with them in his sister's Honda Civic. Grzeszczyk drove, the victim sat in the front passenger seat and Delgado sat in the backseat directly behind the victim. While en route to their fictitious destination, Delgado took out a rope and strangled the victim from behind. As the victim struggled to free himself, Delgado tied the rope, which remained around the victim's neck, to the headrest of the victim's seat and then stabbed him in the forehead with a syringe. Grzeszczyk also struck the victim in the face with his forearm as he was driving. After Schmidt finally succumbed, Grzeszczyk and Delgado dumped his body in the parking lot of the Bethel Church.

Grzeszczyk and Delgado thereafter returned to the Austin Street apartment in New Britain, where they met the defendant and Zampi. At the defendant's urging, Grzeszczyk and Delgado removed the clothes that they were wearing during the murder and gave them to Zampi, who disposed of them. Zampi also drove the Honda Civic in which the victim had been murdered back to Banquer's restaurant and left it in the parking lot.

The defendant and Delgado were arrested for Schmidt's murder on August 14, 2001, and the arrests of Stenner, Zampi and Grzeszczyk followed soon thereafter. The defendant's trial commenced on May 13, 2002, and included testimony from various law enforcement officials, forensic experts and other various witnesses. The focal point of the trial, however, was the testimony of Grzeszczyk, Delgado and Zampi regarding the defendant's role in planning and supervising the victim's murder.

The jury began deliberating in the early afternoon of May 23, 2002, after the trial court instructed it on the law and the rules governing its deliberations. With respect to the latter, the court stated: "You have the right to request testimony to be read . . . back for you . . . . If you want this done, I recommend that you be somewhat precise in what it is that you are actually interested in hearing. If . . . your request is phrased broadly, simply the testimony of a witness, for example, I will give you the direct examination, cross-examination, redirect [and] recross [examination] of the witness in such a case. If that is what you want, your request will be honored. However, if that is not what you want, if you simply want a specific portion of testimony on a specific point, please so indicate so that we will be able to comply precisely with your request."

Later that afternoon, the jury sent a note to the court asking it to play back the testimony of certain witnesses on four different topics. Specifically, the jury asked to rehear the testimony of: (1) Grzeszczyk, Zampi, Delgado, Norma I. Cruz[4] and Noel Torres[5] as to who was living at 86 Austin Street in New Britain on December 19, 1989; (2) Grzeszczyk, Zampi and Delgado with respect to who was present at the "point out" meeting that occurred at Banquer's restaurant; (3) Grzeszczyk, Zampi and Delgado concerning the removal and disposal of Grzeszczyk's and Delgado's clothes after the murder; and (4) Grzeszczyk and Skinner, the investigator with the office of the state's attorney, regarding the dates and substance of Skinner's interviews with

---

[4] Cruz is the defendant's former girlfriend and the mother of his two children. She testified that, on December 19, 1989, she and her children were living in the first floor apartment at 86 Austin Street in New Britain.

[5] Torres testified that he and Delgado were living in the first floor apartment at 86 Austin Street in New Britain on December 19, 1989, and that Cruz had vacated the apartment prior to that date. See footnote 4 of this opinion. Torres also testified that the defendant had asked him to murder the victim before the defendant directed Grzeszczyk and Delgado to do so.

Grzeszczyk, which ultimately led to his arrest and the arrest of his coconspirators, including the defendant. After the court reviewed the jury's request with the jury foreperson in the presence of all of the jurors, the court excused the jury for the day.

The following morning, the trial court convened the jury and explained that its request entailed a substantial amount of testimony and that it would take the court monitor a considerable amount of time to locate all of it in the record. The court reread its initial charge regarding requests to rehear testimony and asked the jury to consider whether its request could be pared down. In particular, the court stated: "[I]f you can be more precise on these things that you've requested, I think that we would appreciate that. But . . . if you cannot, if this is what you want, this much testimony, then we'd be glad to do that. But it is taking some time to get it together, and the [court] monitors have spent four or five hours now, getting [the requested testimony] together . . . . As you know, they have to go through every day and each individual [witness], and so it does take some time.

"So, with that, I guess I'm telling you that we're not ready to answer your questions quite yet. So I will ask that you take a look at this, the request. And if there's nothing you can do with [it], and this is what you want, we'll . . . give you whatever you want. We want to do that. But I will excuse you to the jury room. And you may deliberate. You may do whatever you wish at this point. You may take a look at these questions and give me some indication . . . if you want something different . . . or whatever. We're working on it. We will call you out as soon as we have anything."

The jury caucused briefly and then sent a second note to the court that narrowed the scope of its first request. Specifically, the jury indicated that it wanted

to rehear testimony from Grzeszczyk during "direct and redirect" examination and all of Zampi's testimony regarding "who lived on the first floor of 86 Austin Street on [December, 19] 1989." The second note further stated: "[The jurors] are reviewing the initial request to narrow [its] scope. We will send additional correspondence. We would prefer to start with this request."

Shortly thereafter, the jury foreperson informed the court that, in the second note, the jury meant to ask to rehear Grzeszczyk's testimony on direct and cross-examination, but that it still wanted to rehear all of Zampi's testimony. After a brief recess, the court had the court monitor play back the requested testimony for the jury.[6] Before the court excused the jury to continue its deliberations, it stated, "we're working on other things, and we'll let you know."

Later that morning, the court monitor advised the court that she had retrieved all of the testimony that the jury had sought in its initial note with respect to topics two and three, namely, testimony relating to the "point out" meeting that had occurred at Banquer's restaurant and to the removal and disposal of Grzeszczyk's and Delgado's clothes after the murder. The court consulted with the state's attorney and defense counsel to determine whether it should ask the jury if it still wanted to rehear that testimony or whether the jury had "made any other decisions at this point." The state's attorney objected to such an inquiry because, in his view, the jury's second note superseded its first. He contended that the jury had indicated through its second note that it would get back to the court if it wanted to rehear additional testimony. Because the jury had not yet requested additional testimony, the state's attorney

[6] According to the court, the court monitor was able to retrieve "a short amount of [Grzeszczyk's] direct [examination] testimony" but no cross-examination testimony regarding who was living on the first floor of 86 Austin Street on December 19, 1989.

urged the court not to offer the jury "any more information" at that point.

Conversely, defense counsel argued that the jury did not intend to abandon its initial request, and, therefore, that the court should inform the jury that some of the testimony that it had requested in its initial note was available, and should ask the jury if it still wanted to rehear it. Over defense counsel's objection, the court stated that it did not intend to ask the jury whether it still wanted to rehear the testimony relating to topics two and three but that it would inform the jury that the court would honor any additional requests that the jury might have. Thereafter, the court reconvened the jury and reminded it that its second note indicated that it was reviewing its initial request to rehear testimony in order to narrow the scope of its initial request and that it would send additional correspondence. The court then stated: "I'm not encouraging that. I'm not discouraging that. . . . It's your decision what you want [and] when you want it. . . . I'm just let[ting] you know that we are here . . . to answer any request." The jury then was excused for lunch.

Later in the afternoon, the jury sent a third note to the court in which it requested testimony that was not encompassed within the scope of either its first or second note. Specifically, in the third note, the jury asked to review the testimony of Grzeszczyk on "direct, cross, redirect and recross" examination concerning the meeting that occurred at 86 Austin Street on December 19, 1989. The court promptly had the court monitor replay that testimony for the jury. Approximately two hours later, the jury announced that it had reached its verdict, and it found the defendant guilty of murder as an accessory. The trial court thereafter rendered judgment in accordance with that verdict and sentenced the defendant to sixty years imprisonment. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the trial court abused its discretion in failing to replay for the jury all of the testimony that the jury had requested in its initial note. In support of his claim, the defendant argues that the jury's request to rehear testimony on the four topics embodied in its initial note was reasonable,[7] and, therefore, that the trial court should have directed the court monitor to replay that testimony for the jury. The defendant further contends that the trial court's error was harmful because the testimony that the jury initially had requested but was never afforded an opportunity to rehear was material and exculpatory.

The state responds that the defendant's argument is flawed because the jury abandoned its initial request to rehear testimony when it sent its second note to the court. Put another way, the state contends that the jury indicated in its second note that it would inform the court if it sought to review additional testimony, including testimony pertaining to the four topics encompassed in its initial note, and that, because the jury did not ask to review additional testimony on those topics after it had submitted the second note, the trial court did not abuse its discretion under the circumstances of this case. We agree with the state.

As a preliminary matter we note that "[t]he trial court has discretion to grant a jury's request to review testimony. Practice Book § [42-26];[8] *State* v. *Rivera*, 223

---

[7] The defendant dedicates a substantial portion of his brief to his argument that the jury's initial request to rehear testimony was reasonable. The reasonableness of the jury's initial request, however, is not the issue in this case. Rather, as we explain further in this opinion, the issue is whether the trial court reasonably could have concluded that the jury, through its submission of the second note, did not wish to review any additional testimony until it so notified the court through correspondence.

[8] Practice Book § 42-26 provides: "If the jury after retiring for deliberations request[s] a review of certain testimony, [it] shall be conducted to the courtroom. Whenever the jury's request is reasonable, the judicial authority, after notice to and consultation with the prosecuting authority and counsel for the defense, shall have the requested parts of the testimony read to the jury."

Conn. 41, 48, 612 A.2d 749 (1992). What portions of the record, if any, will be submitted to the jury for [its] consideration is a matter of sound judicial discretion." (Internal quotation marks omitted.) *State* v. *Harris*, 227 Conn. 751, 770–71, 631 A.2d 309 (1993). In determining whether the trial court has abused its discretion, "the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 328–29, 838 A.2d 135 (2004). "[T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 156, 864 A.2d 666 (2004).

In order to determine whether the trial court abused its discretion in this case, we proceed to review the court's responses to each of the four topics covered in the jury's initial request.

I

Topic One: Who Lived at 86 Austin Street?

In the jury's initial note, it asked to review the testimony of Grzeszczyk, Zampi, Delgado, Cruz and Torres on the subject of who lived at 86 Austin Street on December 19, 1989. The jury thereafter narrowed that request in its second note, indicating that, in lieu of rehearing the testimony of all five witnesses, it wanted to rehear only the "direct and redirect" examination testimony of Grzeszczyk and all of Zampi's testimony. The trial court convened the jury to confirm its understanding of the revised request insofar as it pertained to Grzeszczyk's testimony. At that time, the jury foreperson informed the court that the jury meant to ask for the testimony elicited from Grzeszczyk on direct and

cross-examination, as opposed to direct and redirect examination, as stated in its second note.

After the jury was excused, the state's attorney told the court that he thought that the jury wanted to rehear all of Grzeszczyk's and Zampi's testimony on the subject of who lived at 86 Austin Street. In order to resolve any lingering confusion regarding the jury's revised request, the court reconvened the jury and explained to it the difference between direct examination, cross-examination and redirect examination. The court then asked the jury foreperson repeatedly whether the jury only wanted to rehear Grzeszczyk's testimony on direct and cross-examination. The jury foreperson answered "yes" or "correct" each time. After a short recess, the court had the court monitor replay Grzeszczyk's direct examination testimony and informed the jury that Grzeszczyk did not testify on cross-examination about who resided at Austin Street. The court monitor then replayed all of Zampi's testimony on that topic.

Even though defense counsel represented to the trial court that he was satisfied with its efforts to clarify the jury's revised request, the defendant now argues on appeal that the trial court was bound to replay all of Grzeszczyk's testimony, including that elicited on recross-examination, because the jury asked to review all of Grzeszczyk's testimony in its initial note. In other words, the defendant claims that the court should have compelled the jury to rehear testimony that it subsequently decided not to review. The law is clear, however, that a trial court does not abuse its discretion "when it allow[s] the jury to rehear only that testimony that the jury indicated that it wished to rehear." *State* v. *Rivera*, supra, 223 Conn. 48; see also *State* v. *Harris*, supra, 227 Conn. 771 ("[u]nless the court was convinced that an injustice would result, it was not . . . required to force the jury to listen to what it did not want to hear"). Thus, we reject the defendant's claim that the

trial court abused its discretion in failing to replay all of Grzeszczyk's testimony concerning the issue of who resided in the Austin Street apartment on December 19, 1989.

## II

### Topics Two and Three: The "Point Out" Meeting and the Clothes

In its initial note, the jury also asked to rehear testimony concerning the attendees at the "point out" meeting at Banquer's restaurant and testimony concerning the removal and disposal of Grzeszczyk's and Delgado's clothes after the murder. After the court monitor retrieved that testimony from the record, a colloquy ensued between the court, the state's attorney and defense counsel that focused principally on how the court should proceed with the newly retrieved testimony in light of the jury's second note. As we noted previously, the state's attorney argued that the second note superseded the initial note and, therefore, that the court should not inform the jury that the testimony pertaining to the second and third topics was available until the jury notified the court that it wanted to review it. In contrast, defense counsel maintained that the jury did not intend to abandon its initial request by virtue of its second note and, consequently, that the court must ask the jury if it still wanted to rehear that testimony. Although the court acknowledged the arguments advanced by both parties with respect to the meaning of the jury's second note, it stated: "I'm not [going to] read their minds . . . and this is what it meant. It says, 'We will send additional correspondence.' " This statement and other excerpts from the transcript of the proceedings suggest that the trial court adopted the interpretation urged by the state, namely, that the second note superseded the jury's initial note and that

the jury would notify the court if it wanted to review additional testimony.

At the same time, however, the court expressed concern that the jury might not know how to proceed in the absence of further direction from the court. Thus, the court reconvened the jury and: (1) reminded the jury that it had promised to send correspondence once it had made further decisions regarding its initial request; and (2) informed the jury that the court was ready and willing to honor that request or any other requests that it may have. The court did not ask the jury, however, whether it still wanted to rehear the newly retrieved testimony pertaining to topics two and three, which the jury had requested in its initial note. On appeal, the defendant claims that the trial court abused its discretion in failing to make that inquiry. We disagree.

In reviewing claims under the abuse of discretion standard, we have stated that "the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 329. Thus, to resolve the defendant's claim with respect to the jury's initial request to rehear testimony concerning topics two and three, we must determine whether the trial court reasonably could have interpreted the jury's second note to mean that the jury did not wish to rehear additional testimony beyond that specified in the second note unless and until it so notified the court. The second note provided in relevant part: "We are reviewing the initial request to narrow the scope. We will send additional correspondence. We would prefer to start with this request." We believe that those sentences, when viewed in the context of the court's suggestion to the jury that it reconsider its initial request, reasonably could be interpreted to mean that: (1) the jury first would rehear the testimony of Grzeszczyk and

Zampi concerning who lived at 86 Austin Street on December 19, 1989; and (2) following that review, the jury would send correspondence to the court if the jury decided that it wanted to rehear some or all of the testimony pertaining to the other three topics that the jury had requested in its initial note.[9]

We recognize, moreover, that the court's interpretation of the jury's second note is consistent with the

[9] The dissent disagrees with our conclusion that the trial court reasonably could have interpreted the jury's second note in this way because, in that note, the jury wrote: "We would prefer to *start* with this request." (Emphasis added.) In light of that sentence, the dissent contends that the only reasonable interpretation of the second note is that the jury would start by reviewing the testimony specified in that note, "but that it still wished to rehear the rest of the testimony that it had requested [in its first note]." The dissent fails to explain, however, how its position can be squared with the additional passage contained in the jury's second note that provides: "We will send additional correspondence." In other words, if, as the dissent maintains, the only reasonable interpretation of the jury's second note is that the jury did not intend to abandon the requests embodied in its first note, then why would the jury have a need to send additional correspondence to the court? Although we could engage in extensive debate with the dissent over the meaning of the second note, we need not do so in order to determine whether the trial court abused its discretion in this case. Rather, we merely must determine whether the court reasonably could have interpreted that note as it did. See *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 329. For the reasons that we set forth in this opinion, we conclude that a full reading of the jury's second note, when considered in the context of the jury's communications with the court, warrants the conclusion that the court's interpretation of that note was reasonable.

The dissent also asserts that, even if it were to conclude that the court's interpretation of the jury's second note was reasonable, it nonetheless would hold that the trial court abused its discretion because there was no justification for the court to interpret the second note at all. According to the dissent, the court simply could have asked the jury if it still wanted to rehear the newly retrieved testimony that it had requested in its initial note, and its failure to do so "was itself an abuse of discretion." We disagree with the dissent that the trial court was precluded from: (1) interpreting communications from the jury pertaining to requests to rehear testimony; and (2) making decisions on the basis of its reasonable interpretation of those communications. Indeed, we believe that the dissent's view runs counter to the well settled principle that we afford trial courts discretion to determine "[w]hat portions of the record, if any, will be submitted to the jury for [its] consideration . . . ." *State* v. *Harris*, supra, 227 Conn. 770–71.

events that transpired after the court had received that note. Specifically, in the jury's third and final note to the court, it did not request testimony pertaining to the topics that it had requested in its initial note. Instead, the jury requested testimony relating to a wholly separate topic, namely, the meeting that occurred at the Austin Street apartment on December 19, 1989. Furthermore, the fact that the jury reached its verdict without reviewing all of the testimony that it had requested in its initial note suggests that the jury subsequently determined that it did not need to rehear that testimony in order to decide the issue of the defendant's guilt, and, consequently, it did not send additional correspondence to the court renewing its request to do so.[10]

In so concluding, we do not suggest that the defendant's interpretation of the jury's second note is entirely

---

[10] *Although our standard of review requires us to determine whether the trial court's conclusions were reasonable; see* PSE Consulting, Inc. v. Frank Mercede & Sons, Inc., *supra, 267 Conn. 329; the dissent also examines the jury's expectations in light of its communications with the court. To that end, the dissent concludes that the jury must have thought that the court was still assembling the testimony that it had requested in its first note and that the court would inform the jury when that testimony became available. The dissent does not explain how its position can be reconciled with the events that transpired after the jury sent its second note to the court and reheard the testimony requested therein. In our view, these events are incompatible with the dissent's conclusion that the jury must have thought that it would rehear all of the testimony requested in its initial note. Moreover, the fact that the jury reached a verdict without rehearing that testimony undermines the dissent's conclusion that the trial court's actions were harmful to the defendant. See *State* v. *Hinds*, 86 Conn. App. 557, 570–72, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005). In *Hinds*, the Appellate Court concluded that the trial court had abused its discretion in failing to inform the jury that the court monitor had retrieved additional testimony on a topic on which the jury had submitted a question to the court. Id., 570–71. The Appellate Court also concluded, however, that the error was harmless. Id., 571–72. In so concluding, the Appellate Court noted that, "[i]f the jury had believed that it needed a definitive answer to its question in order to reach a verdict, it surely could have awaited the court's review of [the witness'] testimony, and its failure to do so indicates that this information was not a critical factor in its verdict." Id., 571.

implausible. We merely observe that the abuse of discretion standard requires us to indulge in "every reasonable presumption" in favor of the trial court's interpretation of the note and the correctness of its ruling. (Internal quotation marks omitted.) Id. Moreover, when we review claims for an abuse of discretion, "the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently." (Internal quotation marks omitted.) *State v. Day*, 233 Conn. 813, 842, 661 A.2d 539 (1995). Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable. See, e.g., *State v. Delgado*, 261 Conn. 708, 711, 805 A.2d 705 (2002). In this case, it was neither. Consequently, we conclude that the trial court did not abuse its discretion in failing to inquire of the jury whether it wanted to review the testimony pertaining to topics two and three that it had requested in its initial note when that testimony became available for playback.

### III

### Topic Four: Investigator Skinner's Interviews with Grzeszczyk

Finally, the defendant claims that the trial court abused its discretion in failing to replay testimony regarding Skinner's interviews with Grzeszczyk at the Southington police department, which was the fourth topic in the jury's initial request for testimony. In our view, this claim is entirely without merit because there is no indication in the record that the court monitor notified the court that she had retrieved this testimony before the jury reached its verdict. Moreover, even if we assume, arguendo, that the trial court did receive such notification off-the-record, we nonetheless conclude that the court did not abuse its discretion in failing to replay this testimony for the same reason that underlies our conclusion in part II of this opinion: the

court reasonably could have interpreted the jury's second note to mean that the jury did not want to rehear any additional testimony, including that pertaining to topic four, until it so notified the court through correspondence.

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in failing to replay for the jury all of the testimony that the jury had requested in its first note.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and KATZ and VERTEFEUILLE, Js., concurred.

BORDEN, J., dissenting. I disagree with the majority's conclusion that the trial court did not abuse its discretion and, thereby, deprive the defendant, Scott Cancel, of the right to a fair trial. I therefore dissent.

It is important to note that (1) the trial took only eight days of testimony, and (2) all of the exchanges concerning requests to review testimony between the jury and the court occurred over a very short period of time, namely, from approximately 5 p.m. on one day, to 3 p.m. on the next day. An understanding of precisely what the trial court told the jury in its general instructions, what the jury asked for in its various notes to the trial court, and what the court said, and, even more important, did not say to the jury in response to those notes is also critical. In its general instructions, the court told the jury that it had the "right" to request that testimony be reread to it, that it should be precise in making such requests, and that its requests would be honored.

In its first note, the jury asked for four sets of testimony to be reread to it: (1) the testimony of the defendant's three accomplices, all of whom were key state's

witnesses, namely, John Grzeszczyk, Salvatore Zampi and Gilberto Delgado, as well as Norma I. Cruz and Noel Torres, about who was living at the residence where the defendant met with the accomplices to plan the murder when that meeting took place; (2) the testimony of the same three accomplices about the meeting at the restaurant where the victim, Robert Schmidt, was pointed out to Grzeszczyk; (3) the testimony of the same three accomplices about the disposal of the clothing of Grzeszczyk and Delgado after the murder; and (4) the testimony of Grzeszczyk and Lawrence E. Skinner, an investigator with the office of the state's attorney, about the interviews in which Grzeszczyk confessed and implicated the defendant.

The next morning, the court notified the jury that this request entailed a lot of testimony, and that it would take the court monitor considerable time to locate all of it. The court asked the jury if it could be more precise in its request, but stated "if you cannot, if this is what you want, this much testimony, then [we would] be glad to do that. . . . *So, with that, I guess I'm telling you that we're not ready to answer your questions quite yet,*" but that "*[w]e're working on it. We will call you out as soon as we have anything.*" (Emphasis added.) The court also told the jury that it could continue to deliberate if it wished. The clear import of this response, especially in light of the court's initial general instructions, was that complying with the jury's request would take time because the court monitor would have to retrieve a lot of material, but that the court was "working on" complying with it and would let the jury know when it was ready to comply with the request— "We will call you out as soon as we have anything."

The second note, which followed shortly after the court's response to the first note, was a more narrow version of the first request made in the first note, namely, for the testimony of only two of the accom-

plices—Grzeszczyk and Zampi—about who lived at the residence where the murder was planned; the jury did not ask for the testimony of Delgado, Cruz or Torres regarding this subject. The second note also contained the following explanation for this request: "We are reviewing the initial request to narrow the scope. We will send additional correspondence. *We would prefer to start with this request.*" (Emphasis added.)

The obvious purpose of this second note was the jury's attempt to respond, by narrowing its request from five witnesses to two, to the court's request, in response to the first note, that the jury attempt to be more precise in its request. It is also clear, however, that the second note was not meant as a replacement request because the jury stated that it preferred "to *start* with this request." (Emphasis added.) The clear implication of this statement was that the jury would start with this material, but that it still wished to rehear the rest of the testimony that it had requested. Indeed, given that there were several items in the first request that the jury was never supplied with, as I explain in more detail later in this opinion, it is impossible for me to see how this second request reasonably could be interpreted by the trial court as superseding the first.

After complying with the request in the second note, the court stated: "[W]e're working on other things, and we'll let you know." I fail to see how the jury could have interpreted the court's statement as indicating anything other than that the court was "working on *[the]* other things, and we'll let you know" when they have been located, and that those "other things" were the "things" that the jury had requested in its first note. Indeed, that this interpretation is the only way that the jury could have understood this response is compelled by the fact that it was the only way that the court could have meant it, because, in fact, neither the court nor the parties were working on any "other things." Thus, taken in

context with the court's response to the first note, the only reasonable interpretation of this entire exchange between the jury and the court is that the court was telling the jury that it was still attempting to comply with all of the requests made by the jury in the first note and would "let [the jury] know" when it would be able to comply with those requests.

Thus, after the second note and the court's response, the jury must have believed that, although its narrowed request for the testimony about the evidence of who was living where the murder was planned had been complied with, the court was still attempting to locate the remaining testimony requested in the first note. That testimony, not yet produced for the jury, consisted of the testimony of Delgado, Cruz and Torres about who was living where the murder was planned, plus the other three items requested in the first note— namely, the meeting at the restaurant, the disposal of the clothes after the murder, and the interviews with the police in which one of the accomplices confessed and implicated the defendant.

Later that morning, a critical thing happened: the court monitor told the trial court that it had retrieved *all* of the testimony sought by the jury in its second and third requests of the first note. These requests were for the testimony of the three accomplices about the meeting at the restaurant where the victim was pointed out to Grzeszczyk, and the testimony of the same three accomplices about the disposal of the clothes after the murder. Despite the defendant's specific request to the court that it tell the jury that it now had available this evidence, which the jury had specifically requested, the court acceded to the state's position that the second note had superseded the first note. None of this discussion, of course, was in the presence of the jury.

The court then convened the jury and made the following statement: "[Y]our last correspondence indi-

cated that you were reviewing the initial request to narrow the scope." The court then quoted to the jury from its second note: " 'We will send additional correspondence.' " The court then stated: "I'm not encouraging that; I'm not discouraging that. I'm not getting into this at all with you people. It's your decision. It's your decision what you want, when you want it. We're here to do that, *if we can.* I'm just suggesting that—and to let you know that we are here and—to answer any request. And that was something that seemed to be hanging, and I'm just reminding you of that. I'm sure I don't need to, probably. And I'm sure you're diligently going about your task of deliberation. So that's all I have." (Emphasis added.)

This statement to the jury was ambiguous at best. It is true that the court reminded the jury of its first note, and that the requests made therein had not been complied with—"that was something that seemed to be hanging . . . ." At the same time, however, the court also reminded the jury that it had narrowed the scope of the first request, and that it had indicated that it would "send additional correspondence." The court then told the jury that it was there to respond to "what you want, when you want it," but it then qualified that response with "[w]e're here to do that, *if we can.*" (Emphasis added.) The jury could have heard this only as at least an implicit repetition of the court's initial response to its first note, namely, that it would take a long time for the court monitor to locate the requested testimony, and that retrieval of that testimony had not yet been accomplished. As I indicate later in this opinion, I can see no justification for the court's refusal to tell the jury that the information that it sought in two of the four requests in its first note had now been located and was available to be read to the jury.

The third note, sent to the court at 2:45 p.m. on the same day, requested testimony that had not been

included in either of the first two notes, namely, testimony of Grzeszczyk regarding the meeting on Austin Street. The court complied with that request. Yet, the court still did not tell the jury that much of the testimony that it originally had sought in its first note was now available to it. Less than two hours later, the jury rendered its verdict.

I conclude that the court abused its discretion in its treatment of the jury's requests for the rehearing of the testimony that they had requested in their first note. First, it is beyond dispute that very little of the testimony that the jury sought in that first note was ever presented to it; nor was the jury ever told that at least some of the testimony that was not presented was available to it before it rendered its verdict. Given the short length of the trial, and even taking into account the jury's understandable responses to the court's suggestion to it that it attempt to narrow its requests *while the court attempted to comply with the jury's first request,* I simply fail to see why the court did not make any additional efforts to comply with those requests.

Second, the court's response to that first note sent the clear message to the jury that the court was attempting to comply with those four requests, and that *the court would tell the jury when that compliance would be forthcoming.* The jury's response, in the second note, to that message was that it was willing to narrow its request, but that narrowing was something that it was willing *"to start with . . . ."* (Emphasis added.) Thus, the clear implication of this exchange was that the court would tell the jury when it was prepared to comply with the jury's first four requests, and the jury was willing to start with less than it originally had requested until the court informed it that the court was ready to comply. Thus, I see no basis for the majority's conclusion that it was reasonable for the court to conclude that the jury's second note super-

seded its requests in the first note. If that were so, then the jury's response to the court's initial statements to it, namely, that the jury would narrow its requests "to start with," meant nothing.

Third, even if I were to agree that it was unclear whether the jury's second request was intended to supersede its first request, and that it was reasonable for the court to *interpret* it as such, I see no justification on this record for the court to have gone through that interpretive exercise at all. At that point, the court knew that the court monitor had located two of the four batches of testimony that the jury had requested in its first note, and the defendant had requested that the court simply ask the jury whether it still wanted that testimony read to it.

It is beyond me why, instead of granting that eminently reasonable request, which could not have taken more than a moment, the court shielded that important information from the jury and, instead, issued the ambiguous instructions to the jury that it did. Had the court told the jury that the testimony it had asked for was now available, as the defendant asked the court to do, the jury, the state, the defendant, and this court, would *know*, rather than have to guess, whether the second jury note superseded the first note. Furthermore, and most important, the jury would have had the information that it never had in formulating its second and third requests, namely, that at least s*ome* of what it had requested in its first note was now available to it and intelligently could have decided whether it still wanted that testimony. The failure of the court to give the jury this important information was itself an abuse of discretion.

Having decided that the trial court abused its discretion as it did, I also conclude that the error was harmful. This was a case against the defendant that depended

primarily on the testimony of his three accomplices. Indeed, the defendant was not even the actual killer; that task was reserved for Delgado, the rereading of whose testimony the jury sought but did not receive. The requests for rereading of testimony that were never honored by the trial court involved critical testimony of those accomplices, whose credibility as such was necessarily subject to question. I cannot see how it could be otherwise that the *absence* of an opportunity to rehear that testimony, and the jury's ignorance of the fact that some of the testimony was available for it to rehear substantially affected the verdict that the jury ultimately reached.

I would, therefore, reverse the judgment of the trial court and remand the case for a new trial.