******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., concurring. I generally agree with and join parts I and II of the majority opinion and I agree with the majority that the judgment of the Appellate Court, affirming in part the conviction of the defendant, Chywon Wright, should be affirmed. I write separately, however, because I am not persuaded by the majority's conclusion in part I C of its opinion that the trial court abused its discretion by excluding evidence of the victim's[1] actions and statements to Bryan Fuller at a Wolcott Street residence in Waterbury (Wolcott Street) prior to the sexual assault committed by the defendant at a Taylor Street apartment in Waterbury (Taylor Street). In my view, it was not an abuse of discretion for the trial court to have excluded evidence that, under the evidentiary sense of "material" as articulated in the majority opinion, has no bearing on the defendant's theories of consent, or reasonable belief of consent, as to the Taylor Street incident. Accordingly, I concur.

In revisiting our decision in *State* v. *DeJesus*, 270 Conn. 826, 845, 856 A.2d 345 (2004), the majority concludes—and I fully agree—that this court improperly construed the term "material" in General Statutes (Rev. to 2015) § 54-86f (4), the rape shield statute, in its constitutional, rather than evidentiary, sense. The majority concludes, under our renewed understanding of the rape shield statute, that "[t]he evidence that the defense proffered, through the testimony of the victim, was both relevant and material to a critical issue in this case," and, therefore, that "the excluded evidence was admissible under [General Statutes (Rev. to 2015)] § 54-86f (4) and that the trial court abused its discretion by excluding such evidence." In my opinion, the majority's conclusion is not reconcilable with the applicable abuse of discretion standard of review. Applying that standard, I conclude that the trial court did not abuse its discretion in excluding the victim's testimony about the events at Wolcott Street as such events had no nexus to the defendant's subsequent acts at Taylor Street and, therefore, were neither material nor relevant to his defense.

This court has consistently recognized that it will "set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Santos*, 318 Conn. 412, 423, 121 A.3d 697 (2015). Generally, a trial court abuses its discretion when the court "could have chosen different alternatives but has decided the

matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 555, 122 A.3d 555 (2015). When this court reviews a decision of the trial court for abuse of discretion, "the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Cancel*, 275 Conn. 1, 18, 878 A.2d 1103 (2005). Accordingly, "the abuse of discretion standard reflects the context specific nature of evidentiary rulings, which are made in the heat of battle by the trial judge, who is in a unique position to [observe] the context in which particular evidentiary issues arise and who is therefore in the best position to weigh the potential benefits and harms accompanying the admission of particular evidence." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 593 n.24, 10 A.3d 1005, cert. denied,      U.S.      , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

At trial, the defendant's main theory of defense was that the victim consented to his sexual contact at Taylor Street as part of an overarching sex-for-hire transaction encompassing both the Taylor Street incident and the prior transaction at Wolcott Street where the victim performed oral sex on Fuller and another individual in exchange for $250. When defense counsel initially asked the victim during cross-examination why it was that Fuller owed her money, the state objected on the ground that such a line of inquiry was irrelevant to the events that transpired at Taylor Street. The defendant countered that the testimony was relevant to his defense that the victim consented via an extended sex-for-hire transaction that spanned both locations. In response, the trial court dismissed the jury from the courtroom and held a hearing pursuant to the rape shield statute in order to vet whether the testimony was relevant and material to the theory of defense.

At the hearing, the trial court stated that the defendant's argument would support the conclusion that the prior transaction at Wolcott Street was relevant "if . . . Fuller were the defendant in this case," but it did not see the connection between the victim's transactions with other individuals and the defendant's theory that the victim consented to a sexual transaction with him specifically. Defense counsel responded that his theory was that the defendant was a "third-party beneficiary" of the sexual transaction between Fuller and the victim. Significantly, however, counsel offered no evidence in support of that assertion. Throughout the hearing, the state maintained that the testimony regarding the victim's sexual contact with Fuller at Wolcott Street was irrelevant to the issue of whether the victim consented to the defendant's conduct at Taylor Street. Ultimately,

the trial court concluded that it would allow "[n]o questions about what happened prior" to the incident at Taylor Street until the defendant was able to proffer evidence "appropriate to establish the issue of consent . . . ."

During the presentation of his case, the defendant recalled the victim as a witness and again attempted to question her as to her interactions with Fuller at Wolcott Street. After having the jury dismissed from the courtroom, the trial court informed defense counsel that it still would not allow questions about events that transpired at Wolcott Street. In response, defense counsel repeated his theory that the Wolcott Street and Taylor Street incidents were "one [and] the same." The trial judge reaffirmed his previous restriction on questions concerning Wolcott Street: "I'm trying to give you as much leeway here as I can, considering both the rape shield statute and your client's constitutional rights. But what's important in my view and *relevant* is what happened at 19 Taylor Street, and I don't consider it, in my view, as one transaction. . . . The questions related to Taylor Street, I'm going to listen to, but not related to Wolcott Street. That, I don't consider to be a continuation of the same transaction." (Emphasis added.) Accordingly, again having determined that the inquiry into Wolcott Street was not relevant to the defendant's theory of consent, the trial court continued to prevent questioning on that point. During this second colloquy outside the presence of the jury, the defendant did not offer any additional evidence that would have explained how the events that took place at Wolcott Street between the victim and Fuller were relevant and material to his theory that she consented to the events at Taylor Street.

When viewed in the context of the other evidence presented at trial, the trial court's application of the rape shield statute to prevent the defendant from questioning the victim about the events at Wolcott Street was clearly well within the trial court's discretion. Indeed, there is no evidentiary support for the defendant's contention that the victim's sexual activity with *Fuller* at Wolcott Street implied the victim's consent to *the defendant's* sexual contact with her at Taylor Street. The defendant's theory that Fuller negotiated a sexual transaction at Wolcott Street for the benefit of the defendant and the other individuals at Taylor Street was repeatedly disavowed at the rape shield hearing by both the victim's testimony and the defendant's statement to the police that the victim was unaware that the defendant and others at Taylor Street planned to sexually assault her. There is simply no link between the two incidents other than the fact that the victim was a prostitute and that Fuller was present at both locations. In my view, the trial court properly concluded, therefore, that any testimony relating to the victim's actions with Fuller at Wolcott Street was irrelevant and immaterial to the

charges brought against the defendant for his actions at Taylor Street.

The other evidence presented at trial—which was before the trial court when it made its determination to exclude testimony related to Wolcott Street—plainly demonstrates that the victim's actions at Wolcott Street have no relevant and material link to the defendant's defense of consent. First, the victim's testimony both at trial and at the hearing establishes that the events at Taylor Street were not a continuation of the transaction at Wolcott Street. Indeed, there is no evidence that the victim went to Taylor Street for the purpose of offering sexual services to the defendant or his fellow gang members in exchange for money, rather than for the benign reason of collecting payment from Fuller for her previous services. At the Wolcott Street residence, the victim and Fuller negotiated for her services. In the course of doing so, the victim offered to have sex with Fuller and three other men for $500. The victim testified, however, that Fuller never accepted that offer. Instead, the victim performed oral sex on Fuller and a companion for the agreed sum of $250. The victim then accompanied Fuller to Taylor Street because "Fuller owed [her] money" for her services at Wolcott Street. On cross-examination at the hearing, defense counsel asked the victim: "[W]hile you were on your way over there, [Fuller] said that there was going to be three or four other guys there . . . . At Taylor Street? . . . So you understood that to have sex with those three or four other guys. Correct?" The victim denied any such understanding between her and Fuller, testifying that she expected the individuals at Taylor Street to "holler" and "catcall" at her, and "[t]hat's what [she] took it as, *not sex*." (Emphasis added.) Fuller told the victim that the money was located on the second floor of the Taylor Street residence, where, instead, she was ultimately sexually assaulted by the defendant and his fellow gang members. On further questioning by the defense, the victim specifically stated that she was *not* going to Taylor Street to have sex with additional men for more money. The victim repeated numerous times in response to questions from defense counsel and the prosecutor that she did not go to Taylor Street in order to have sex pursuant to an earlier agreement with Fuller.[2] When the victim entered the second floor of the Taylor Street residence, someone locked the door and she was forced to comply with the demands of the defendant and other individuals for sexual acts because, as she testified: "I was scared that if I didn't, that I was going to get hurt and not be able to get out of there." The victim testified that the defendant himself "took his hand and put it only the back of my head and forced my mouth [o]nto his penis."

Second, Fuller's own testimony confirms the victim's assertion that she did not intend to have sexual relations with anyone at Taylor Street pursuant to a deal made

with Fuller at Wolcott Street. In his testimony, Fuller reiterated multiple times that at Taylor Street, "[he] was just supposed to pay [the victim]. There was no arrangement for anything," and the victim believed only that she would be collecting $250 at Taylor Street. Fuller further testified: "That was my whole intention for her to go there and have sex with them. I basically set the whole thing up *without her knowing* . . . . [S]he was standing by me and she didn't know what was going on at the time. She didn't know nothing. All she knew that she was supposed to get paid and that was it." (Emphasis added.) Thus, while the victim remained unaware of Fuller's designs en route to Taylor Street, Fuller telephoned his friends "Yajo" and "T Money" and informed them that he was bringing the victim to Taylor Street to have sex with them. Notably, Fuller did *not* call ahead to the defendant to inform him of his plans concerning the victim. Following the assault, Fuller confronted the victim as she was leaving and told her that "it wasn't supposed to go down like that," and acknowledged that the victim "felt violated." Fuller's testimony therefore comports with the victim's testimony that the Taylor Street incident was distinct and separate from the events at Wolcott Street and was not linked by an overarching sexual transaction that spanned both locations. The evidence reveals only that the victim was deceived by Fuller into believing that the sole purpose of going to Taylor Street was to obtain payment for the transaction at Wolcott Street. The fact that Fuller deceived the victim in this manner did not render the transaction between Fuller and the victim relevant to the issue of whether she consented to sexual acts with the defendant at Taylor Street.

Finally, and perhaps most tellingly, the defendant's own postarrest statement to the police—that was fully admitted into evidence—demonstrates that the events at Taylor Street were not an outgrowth of the consensual, sex-for-hire transaction that previously occurred at Wolcott Street between Fuller and the victim. The defendant stated that when Fuller and the victim arrived at Taylor Street he heard Fuller "tell [the victim] that the money he owes her is upstairs on the second floor but *I knew he was lying to her* because he told me that [he was lying to her] and I also know that the second floor is a vacant apartment. The [victim] kept asking him for the money so we all went up to the second floor . . . . The whole time this was going on the [victim] *thought she was gonna get her money but* [*Fuller*] *was telling all of us that we was gonna fuck this girl*." (Emphasis added.)

The defendant's further statements reveal that his actions were not part of a consensual interaction: "I know [the victim] didn't like us smackin her ass because she told us it hurt and to stop. . . . I grabbed [the victim] and put her head on my dick so she would suck it. . . . I could tell at this point that the [victim] wasn't

liking this and she started to look scared. . . . The [victim] then said that she was scared and afraid that we was gonna kill her. We was telling her that we ain't gonna kill her but we wanna fuck her. . . . [W]e wasn't letting her leave until we were done with her." Notably, when recounting how the victim was forced to perform oral sex, the defendant specifically stated that he "didn't see [Fuller] get his dick sucked [at Taylor Street]," despite his own contention that Fuller was the link between the Taylor Street and Wolcott Street incidents. The defendant's own account further reinforces the conclusions drawn from both the victim's and Fuller's testimony that the Taylor Street incident was not a consensual outgrowth of the sex-for-hire transaction consummated by Fuller and the victim at Wolcott Street. Perhaps if the defendant had testified at trial he may have added additional detail that would have supported a defense of consent or reasonable belief thereof. The defendant, however, decided not to testify, due likely in part to his knowledge that he would possibly have been impeached and discredited on cross-examination by the content of his written statement, which clearly contradicts any potential evidence of consent.

Overall, the defendant's statement and the testimony of Fuller and the victim all convey a similar sequence of events: the victim performed oral sex on Fuller in exchange for money at Wolcott Street; Fuller brought the victim to Taylor Street under the pretext of collecting her payment; and Fuller, the defendant, and the other gang members actually intended, without any previous indication to the victim, to sexually assault her at Taylor Street. In my examination of the evidence, there is absolutely no link between the consensual transaction consummated by the victim and Fuller at Wolcott Street and the issue of whether the victim consented to the defendant's actions at Taylor Street. In my view, the trial court did not abuse its discretion in likewise determining that there was no connection between the two incidents that would render the Wolcott Street evidence material to the defendant's consent defense. Indeed, the defendant's theory of consent essentially boils down to the argument that because the victim had sexual relations with Fuller in exchange for money at Wolcott Street, she also consented to the defendant's acts at Taylor Street.

I am unconvinced, as the trial court apparently was as well, that consent granted to one individual at a particular location implies consent to a completely different person at a geographically distinct location with no clear connection to the events at the first location. The only fact that could possibly support such a theory is the victim's prostitution[3] at Wolcott Street, which the trial court excluded as irrelevant to the issue of consent at Taylor Street. The majority opinion contends that the victim's prior prostitution with Fuller was *not* the

only evidence supporting the defense theory and that the alleged multiperson, sex-for-hire transaction was also relevant. The majority, however, points to no place in the record where the testimony of Fuller or the victim definitively evinces that such a transaction was bargained for, agreed upon, or acted out. In fact, the *only* place in the record where such a theory is mentioned is in defense counsel's questions on cross-examination and statements to the court during the rape shield hearing, not in the testimony of any of the witnesses. And the statements of counsel are, of course, *not* evidence. Under the majority's approach, however, the fact that the defendant presented a theory of consent in his questioning and arguments, but without any evidentiary basis in the trial testimony, is sufficient to render the victim's prior prostitution at Wolcott Street relevant and material. Such self-fulfilling materiality, whereby evidence becomes material to the central theory of defense simply because defense counsel declares it so, erodes the discretion of the trial court under the rape shield statute to consider the materiality and relevancy of proffered evidence and determine the admissibility of such evidence.

Under my review of the record, the trial court properly rejected the theory that a woman's act of prostitution with one individual, without more, is necessarily relevant to the issue of whether she has consented to have sex with a different individual. When stating its opposition to the defense theory at the rape shield hearing, the state summed up its counterpoint before the trial court in clear, unmistakable language: "Prostitutes [can] be raped, Your Honor." Had it been *Fuller* presenting this defense and not *the defendant*, the theory of consent via an extended sex-for-hire transaction would be much more plausible given Fuller's clear connection with both locations. The defendant, however, presented no evidence of such a connection to the trial court. Our decisions in this context recognize that "[e]vidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy . . . to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Crespo*, 303 Conn. 589, 603, 35 A.3d 243 (2012). The testimony concerning events at Wolcott Street is exactly that: entirely unconnected from the issue of consent at Taylor Street and therefore immaterial and irrelevant to the central theory of the defense.

Accordingly, I would conclude that the trial court properly exercised its discretion in excluding the Wolcott Street testimony because such testimony was not material and relevant to the defense and its exclusion inflicted no harm on the defendant's constitutional rights. I therefore respectfully concur in the judgment.

[1] See footnote 1 of the majority opinion.

[2] "[Defense Counsel]: Did you get any money for Wolcott Street?

"[The Victim]: No.

"[Defense Counsel]: So when you went to Taylor Street, your purpose was to sexually service a number of other guys to get the $250?

"[The Victim]: No.

"[Defense Counsel]: It wasn't?

"[The Victim]: No.

\* \* \*

"[Defense Counsel]: Okay. And so prior to that, you knew you were going to Taylor Street for the purposes of having sex. Correct?

"[The Victim]: No.

\* \* \*

"[Defense Counsel]: Did you have a conversation with . . . Fuller where the figure $500 came up as a fee for your services?

"[The Victim]: Right. For Wolcott Street.

\* \* \*

"[Defense Counsel]: You had no expectations of having sex with anybody in that [Taylor Street] apartment?

"[The Victim]: No.

"[Defense Counsel]: Isn't it true that you went there, agreed to have sex for money, and there wasn't any force involved? Isn't that true?

"[The Victim]: No.

\* \* \*

"[The Prosecutor]: When you went to 19 Taylor Street, did you intend to have sex with anyone?

"[The Victim]: No.

"[The Prosecutor]: When you went into that second floor apartment, did you intend to have sex with anyone?

"[The Victim]: No.

"[The Prosecutor]: Did you consent to have sex with anyone?

"[The Victim]: No."

[3] It is difficult to imagine a defendant raising a defense similar to that in the present case in a case where the victim is *not* a prostitute. For example, it would severely strain credulity for a defendant to argue that because a victim had consensual sex with a romantic partner at one location, the victim's consent to the initial sexual encounter could be "transferred" to a group of unrelated individuals at a second location.

---